OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 The novel question presented by this appeal is whether the Employee Retirement Income Security Act (ERISA) preempts plaintiffs medical malpractice, breach of contract and breach of fiduciary duty claims against a primary care physician who allegedly delayed in submitting a specialist’s referral form for approval by a health maintenance organization (HMO) governed by ERISA. Concluding that ERISA does
 
 *215
 
 not preempt plaintiff's claims, we reverse the Appellate Division’s dismissal order and reinstate the complaint against the doctor.
 

 In January 1992, plaintiff’s husband, Glenn Nealy, then 37 years old, was diagnosed with coronary arteriosclerosis and a coronary artery lesion. As a result, Mr. Nealy took disability leave from his job at Photocircuits Corporation and was treated for his condition by a cardiologist, Dr. Stephen Green. His treatment, which included an angioplasty performed by Dr. Green in March 1992, was in large part covered by Blue Cross/ Massachusetts Mutual, the carrier selected by Photocircuits to provide employee medical insurance. Around the time of Mr. Nealy’s angioplasty, Photocircuits replaced its carrier with a choice of three HMOs, including US Healthcare, and informed its employees that coverage would become effective April 1, 1992. Mr. Nealy promptly enrolled in the US Healthcare Versatile Plus HMO, which allowed its members to see nonparticipating physicians, and paid his first monthly premium.
 

 On April 2, and again on April 3, Mr. Nealy visited the offices of defendant, Dr. Ralph Yung, whom he had selected as his primary care provider under the US Healthcare HMO.
 
 [1]
 
 He experienced renewed chest pain and also required follow-up care as a result of the angioplasty. On his first visit, Mr. Nealy was denied an appointment because he had not yet received a US Healthcare identification number. The next day, he spoke with a US Healthcare representative who told him that a copy of his enrollment form could be presented in lieu of an identification number, and he made a second attempt to visit Dr. Yung. Again he was turned away — this time because his enrollment form bore the wrong primary physician number.
 

 On April 10, 1992 — having received his US Healthcare identification card the previous day — Mr. Nealy was examined by Dr. Yung. During that visit, Dr. Yung took a patient history that noted a history of angina and angioplasty, performed a routine new-patient physical examination, and renewed all the medications that had been prescribed by Dr. Green. At Dr. Yung’s request, Mr. Nealy returned on April 13 to provide blood and urine samples for laboratory analysis. When Dr. Yung informed him during one or both of these visits that he should see a cardiologist, Mr. Nealy requested a referral to Dr.
 
 *216
 
 Green, who was not a participating US Healthcare provider. Dr. Yung allegedly assured his patient that he would submit a request to US Healthcare to approve an out-of-plan referral and do what he could to secure approval of the request. It was not until approximately April 20, however, that Dr. Yung completed a nonparticipating provider request form and submitted it for approval to US Healthcare.
 
 [2]
 

 On May 4th, Mr. Nealy received a copy of a letter from US Healthcare addressed to Dr. Yung denying the request for a referral to Dr. Green. The reason given was that US Healthcare had a participating provider in the area. After the referral to Dr. Green was denied, Mr. Nealy decided to accept a referral to Dr. Carl Spivak, a participating US Healthcare cardiologist. He obtained the referral to Dr. Spivak on May 18 and promptly made an appointment for the next day. Tragically, however, on May 18 Mr. Nealy suffered a massive myocardial infarction and died.
 

 Seeking to recover damages for her husband’s death, plaintiff commenced this action in Supreme Court asserting breach of contract, breach of fiduciary duty, wrongful death, negligence and other claims against defendants Dr. Yung, Dr. Richard H. Bernstein (vice-president and director of US Healthcare), US Healthcare and two subsidiaries. Plaintiff also asserted medical malpractice claims against Dr. Yung and Dr. Bernstein. Dr. Bernstein and US Healthcare successfully sought removal of the case to Federal court, where the claims were dismissed on the ground that they were preempted by ERISA (844 F Supp 966 [SD NY]), and no appeal was taken to determine the correctness of that decision. Because Dr. Yung — who had not yet been served with the summons and complaint — did not take part in the removal motion, the Federal court remanded the case against him, as the sole remaining defendant, to Supreme Court.
 

 After service of process and discovery, Dr. Yung moved for summary judgment seeking dismissal of the complaint, alleg
 
 *217
 
 ing that ERISA preempted plaintiffs claims against him as well. Supreme Court denied the motion. The Appellate Division, however, reversed and dismissed the complaint, concluding that ERISA preempted plaintiffs claims. We disagree and now reinstate plaintiffs complaint against Dr. Yung.
 

 Discussion
 

 Concerned with employee pension plan abuses and mismanagement, Congress in 1974 enacted ERISA, a comprehensive statute “designed to promote the interests of employees and their beneficiaries in employee benefit plans”
 
 (Aetna Life Ins. Co. v Borges,
 
 869 F2d 142, 144 [2d Cir],
 
 cert denied
 
 493 US 811;
 
 see also,
 
 29 USC §§ 1001, 1001a, 1001b). ERISA subjects employee benefit plans to participation, funding and vesting requirements as well as rules regarding reporting, disclosure and fiduciary responsibility (29 USC § 1021
 
 et
 
 seq.;
 
 see also, Shaw v Delta Air Lines, Inc.,
 
 463 US 85, 90-91). By imposing these requirements, Congress sought “to insure against the possibility that the employee’s expectation of * *
 
 *
 
 benefit [s] would be defeated through poor management by the plan administrator”
 
 (Massachusetts v Morash,
 
 490 US 107, 115). In aid of its goal of protecting plan participants and their beneficiaries, ERISA facilitates the development of a uniform national law governing employee benefit plans, and a standard system to guide the processing of claims and disbursement of benefits
 
 (New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co.,
 
 514 US 645, 656-657
 
 [Travelers]).
 

 ERISA’s preemption provision is central to achievement of its statutory purposes. The provision reads that ERISA “shall supersede any and all State laws insofar as they * * * relate to any employee benefit plan” covered by ERISA, and it applies to both State statutes and common law (ERISA § 514 [a] [Pub L 93-406, tit 1], 29 USC § 1144 [a]; ERISA § 514 [c] [1], 29 USC § 1144 [c] [1];
 
 Pilot Life Ins. Co. v Dedeaux,
 
 481 US 41, 46). Although the language of the preemption clause is “deliberately expansive,” there is a presumption that Congress does not intend to supplant State law, and a claim traditionally within the domain of State law will not be superseded by Federal law “ ‘unless that was the' clear and manifest purpose of Congress’ ”
 
 (Travelers, supra,
 
 514 US, at 654-655).
 

 The issue before us is whether ERISA’s preemption clause bars plaintiffs medical malpractice, breach of contract and breach of fiduciary duty claims against her husband’s primary
 
 *218
 
 care physician, Dr. Yung. All of these claims fall within the traditional domain of State regulation. Dr. Yung, therefore, bears the “considerable burden” of overcoming the presumption that Congress did not intend to preempt them
 
 (De Buono v NYSA-ILA Med. & Clinical Servs. Fund,
 
 520 US 806, 814
 
 [De Buono]).
 
 In an attempt to surmount that formidable hurdle, Dr. Yung alleges that ERISA preempts these claims because they “relate to” the administration of the US Healthcare HMO. The Appellate Division agreed, holding that he was protected by ERISA preemption because he had acted in a “purely administrative” capacity, and not as an “actual provider of medical care” (251 AD2d 144). We conclude that plaintiffs claims against Dr. Yung do not “relate to” an employee benefit plan.
 

 The simple statutory words “relate to” have been the subject of significant scholarly comment and litigation, including considerable attention from the United States Supreme Court
 
 (see, De Buono, supra,
 
 520 US, at 808, n 1;
 
 see also,
 
 Jacobson and Pomfret,
 
 Form, Function, and Managed Care Torts: Achieving Fairness and Equity in ERISA Jurisprudence,
 
 35 Hous L Rev 985 [1998]; Fisk,
 
 The Last Article About the Language of ERISA Preemption?: A Case Study of the Failure of Textual-ism,
 
 33 Harv J on Legis 35 [1996]; Pittman,
 
 ERISA’s Preemption Clause and the Health Care Industry: An Abdication of Judicial Law-Creating Authority,
 
 46 Fla L Rev 355 [1994]). On the one hand, virtually any State law may be said to “relate to” an employee benefit plan, for “ ‘universally, relations stop nowhere’ ”
 
 (Travelers, supra,
 
 514 US, at 655). On the other hand, application of the preemption clause to “the furthest stretch of its indeterminancy” would render Congress’ words of limitation a “mere sham” and nullify the presumption against preemption
 
 (id.).
 
 Plainly, there is tension between the “deliberately expansive” language of the preemption clause— which, applied literally, would operate to shield benefit plans— and ERISA’s goal of protecting employees from abuses at the hands of such entities.
 

 After many years of broadly interpreting ERISA’s preemption clause, in 1995 the United States Supreme Court adopted a more pragmatic approach, noting that its prior efforts to define “relate to” did not always afford “much help drawing the line”
 
 (Travelers,
 
 514 US, at 655-656). Whereas the Court had previously explained that a law “relates to” an employee benefit plan if it has a connection with or makes reference to such a plan, in
 
 Travelers
 
 the Court acknowledged that even that defi
 
 *219
 
 nition of the phrase failed to provide adequate guidance
 
 (id.,
 
 at 656). Thus, the Court concluded, in determining whether a State law relates to an employee benefit plan, it is often necessary to
 
 “go
 
 beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive”
 
 (Travelers,
 
 514 US, at 656;
 
 see also, De Buono, supra,
 
 520 US, at 813 [where there is no clear “connection with or reference to” an ERISA benefit plan, consideration must be given to the objectives of ERISA to determine whether the presumption against preemption has been overcome]).
 

 In
 
 Travelers
 
 itself, the Supreme Court concluded that a State statute imposing surcharges on hospital bills paid by certain employee benefit plans, but exempting Blue Cross/Blue Shield plans, was not preempted by ERISA. Arguing for preemption, the commercial insurers asserted that the surcharges had an indirect economic effect on choices made by insurance buyers, including ERISA plans, and as such, the State statute had a “connection with” those plans. The Supreme Court, however, held that the indirect economic influence of the surcharges did not interfere with the congressional goal of uniform standards of plan administration. The statute did not “bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself,” nor did it “preclude uniform administrative practice or the provision of a uniform interstate benefit package” (514 US, at 659-660). The effect of the law bore only on “the costs of benefits and the relative costs of competing insurance to provide them,” and the law was therefore not preempted by ERISA
 
 (id.,
 
 at 660;
 
 see also, De Buono, supra,
 
 520 US, at 813-815;
 
 Boggs v Boggs,
 
 520 US 833, 839-841;
 
 California Div. of Labor Stds. Enforcement v Dillingham Constr., N. A., Inc.,
 
 519 US 316, 331-334).
 

 Here, plaintiff alleges that Dr. Yung, as a direct provider of medical services, violated the duties and standard of care owed to his patient by improperly assessing the nature and extent of his condition and by failing to take reasonable steps to provide for his timely treatment by a specialist. Viewed pragmatically, those claims are not preempted by ERISA. Plaintiff’s allegations of negligent medical care do not “relate to” the adminis
 
 *220
 
 tration of an ERISA plan
 
 [3]
 
 merely because they refer to Dr. Yung’s delay in submitting the US Healthcare form seeking a referral to Dr. Green. Plaintiff does not allege that Dr. Yung is responsible for delay caused by US Healthcare’s decision-making process with respect to coverage or benefits. Her claim against Dr. Yung is that he failed to take timely action to treat her husband.
 

 Provision of medical treatment under an HMO or other managed care plan often requires reference to that plan’s administrative procedures or requirements. In this case, for example, under the terms of the US Healthcare HMO plan, Mr. Nealy’s primary care physician was required to complete and submit a referral form in order to obtain treatment by a specialist for his patient. That alone, however, does not transform Dr. Yung into an ERISA plan administrator, or plaintiffs State law action charging violations of a physician’s duty of care into claims that “relate to” ERISA plan administration. While plaintiffs claims make reference to US Healthcare’s administrative framework, any effect those claims may have on an employee benefit plan is “too tenuous, remote or peripheral” to warrant a finding that they “relate to” such a plan
 
 (Shaw v Delta Air Lines, Inc., supra,
 
 463 US, at 100, n 21).
 

 Moreover, considering the objectives of the ERISA statute, it is clear that Congress did not intend to preempt claims such as those now before us. Plaintiffs claims do not bind an employee plan to any particular choice of benefits, do not dictate the administration of such a plan and do not interfere with a uniform administrative scheme. Indeed, plaintiff does not challenge any administrative determination relating to an employee benefit plan or the extent of rights and benefits under such a plan. In short, there is nothing about plaintiffs claims
 
 *221
 
 that “conflicts with the provisions of ERISA or operates to frustrate its [objectives]”
 
 (Boggs v Boggs, supra,
 
 520 US, at 841). To the contrary, plaintiffs claims are consistent with ERISA’s “principal object”: the protection of plan participants and beneficiaries
 
 (id.,
 
 at 1762).
 

 Finally, the Appellate Division would have dismissed plaintiffs complaint on the independent ground that she failed to demonstrate that any deviation from professional standards was a proximate cause of Mr. Nealy’s demise. At this juncture in the litigation, however, we cannot agree with that conclusion as a matter of law.
 

 Accordingly, the Appellate Division order should be reversed, with costs, and the order of Supreme Court reinstated.
 

 Judges Bellacosa, Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order reversed, etc.
 

 [1]
 

 . Dr. Yung disputes plaintiffs allegation that Mr. Nealy visited his offices on April 2 and 3, admitting only that he first saw Mr. Nealy on or about April 10.
 

 [2]
 

 . The parties dispute whether the nonparticipating referral form— instead of a “Versatile” form — was submitted to US Healthcare at Mr. Nealy’s request or the result of Dr. Yung’s error. A “Versatile” referral would have allowed treatment by a nonparticipating doctor but required Mr. Nealy to pay a $250 deductible. Plaintiff maintains that Mr. Nealy never expressed a desire to avoid payment of the deductible and was motivated only by a desire to see his cardiologist as soon as possible. Dr. Yung claims that Mr. Nealy did not want to pay the deductible, which is why the nonparticipating referral form was submitted.
 

 [3]
 

 . We leave for another day the issue whether the US Healthcare HMO was even a “plan” within the meaning of the ERISA preemption provision. The Secretary of Labor, charged with interpreting and enforcing the provisions of ERISA, in a brief supporting plaintiffs position, notes that the US Healthcare HMO at issue here is not an ERISA plan at all, but rather a service provider to the ERISA plan established by Photocircuits, Inc. ERISA defines an “employee welfare plan” as “any plan, fund or program * * * established or maintained by an employer * * * for the purpose of providing for its participants and beneficiaries, through the purchase of insurance or otherwise * * * medical, surgical, or hospital care or benefits” (29 USC § 1002 [1]). Commentators have observed that there is some “confusion” as to whether this “tautological” definition encompasses HMOs and other managed care organizations
 
 (see,
 
 Jacobson and Pomfret,
 
 op. cit.,
 
 at 1020-1022). The issue was not raised by the parties and, given the result we reach, would in any event be immaterial.