WENDY HINTERLONG, as Independent Adm'r of the Estate of Dorothy T. Wollin, Deceased, Plaintiff-Appellant, v. S.P. BALDWIN *et al.*, Defendants (Dreyer Health Maintenance Organization, a/k/a Dreyer Health Plan, Defendant-Appellee).

Second District   No. 2—98—1194

Opinion filed November 4, 1999.

Kenneth C. Chessick, Patricia E. Raymond, John W. Fisk, Cary S. Ches-

sick, Joan R. Stohl, and Eric R. Holdridge, all of Law Office of Kenneth C. Chessick, of Schaumburg, for appellant.

Linda E. Unger and Vincent P. Tomkiewicz, both of Rivkin, Radler & Kremer, of Chicago, for appellee.

JUSTICE RAPP delivered the opinion of the court:

Plaintiff, Wendy Hinterlong, as independent administrator of the estate of her deceased mother, Dorothy Wollin, appeals from summary judgment entered in favor of defendant Dreyer Health Maintenance Organization (Dreyer HMO), a/k/a Dreyer Health Plan. Plaintiff contends the trial court improperly concluded that her state law claim for medical malpractice based upon a theory of vicarious liability was preempted by section 514(a) of the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1144(a) (1994)). We vacate and remand.

## I. BACKGROUND

In December 1993, while undergoing surgery to correct coronary artery disease, Dorothy suffered a massive heart attack. She died shortly thereafter. At the time of her death, Dorothy was a member of Dreyer HMO, later known as Dreyer Health Plan.

In June 1994, plaintiff, as independent administrator of Dorothy's estate, brought an 18-count complaint in the circuit court of Kane County against numerous parties for negligent medical treatment that resulted in Dorothy's death. Counts XVII and XVIII were directed against defendant for wrongful death and survival actions and were premised upon a theory of vicarious liability.

Defendant is structured as an "Independent Practice Association" or "IPA model" health maintenance organization (HMO). An IPA, as opposed to a "staff model" HMO, is an entity that arranges and pays for health care for its members by contracting with independent medical groups, clinics, or physicians, instead of providing health care through its own salaried employees. Defendant contracted with the Dreyer Clinic (clinic) to provide medical services to defendant's members. The clinic was a corporate entity that wholly owned defendant.

The contract between the clinic and defendant provided for a system of managed care known as global capitation. Under this system, defendant paid the clinic premiums obtained from an employer, less a 10% administrative fee and a percentage for pharmacy expenses. In exchange, the clinic assumed the financial risks of providing complete medical care for defendant's members. This included the expense of treatment by specialists employed by the clinic, specialists not

employed by the clinic, and hospitalization when necessary. If the total cost of care provided to all defendant's members was less than the total amount of premiums received, the clinic kept the profit. If the opposite was true, the clinic had to absorb the excess. When the clinic made a profit from its relationship with defendant, the physicians employed by the clinic received bonuses.

In 1989, defendant entered into a contract with Dorothy's employer, AT&T, to arrange for health care services for eligible employees who enrolled with defendant. In exchange, AT&T paid a portion of the premiums for employees who chose defendant as its health care provider. Defendant was only one option in AT&T's comprehensive employee welfare benefit plan. Defendant entered into similar contracts with numerous other employers. Pursuant to AT&T's employee welfare benefit plan, Dorothy enrolled with defendant.

Defendant required each member to choose a primary care physician (PCP) who was responsible for providing primary medical care to the member and, if necessary, making written referrals to specialists and recommending hospitalization. If a member's PCP recommended hospitalization, final approval would have to be given by the clinic's utilization review department. Defendant did not conduct independent utilization review of a PCP's recommendation. Instead, under the global capitation agreement, defendant created financial incentives for the clinic, vis à vis the physicians, to keep hospitalization and non-clinic specialist referrals to a minimum.

From April 1991 through December 1993, Dorothy sought treatment from the clinic physicians for a heart condition. In her complaint, plaintiff contended that the care Dorothy received was negligent. Specifically, plaintiff cited a failure to timely diagnose and aggressively treat Dorothy's life-threatening condition, to timely refer her to a specialist, and to timely hospitalize her. Plaintiff further alleged Dorothy's treating physicians were agents of defendant and stated 12 reasons why defendant was vicariously liable for Dorothy's death.

Soon after plaintiff filed her complaint, defendant petitioned for removal to federal court and subsequently moved for dismissal or summary judgment based upon the preemption provision of section 514(a) of ERISA (29 U.S.C. § 1144(a) (1994)). After a hearing on the merits of defendant's preemption claim, the United States District Court for the Northern District of Illinois denied the petition for removal and remanded the case to the trial court. In its summary order denying removal, the district court relied on its earlier ruling in *Smith v. HMO Great Lakes*, 852 F. Supp. 669 (N.D. Ill. 1994), in holding that plaintiff's claims for medical malpractice and wrongful death were not

preempted by ERISA. Defendant did not appeal this ruling to the federal appeals court.

Instead, upon remand, defendant filed an answer to plaintiff's complaint in which it denied each and every allegation of negligence and further denied that Dorothy's treating physicians were its agents, real or apparent. Defendant also raised three affirmative defenses, including ERISA preemption, which it had already raised and fully litigated in the district court. Following a lengthy discovery period, defendant moved for summary judgment based upon both ERISA preemption and the substantive merits of the complaint. In a detailed written order the trial court, in spite of the earlier ruling by the district court, granted summary judgment based upon ERISA preemption but stated that summary judgment would be inappropriate based upon the merits of the complaint because it determined that a genuine issue of material fact existed as to the agency relationship between defendant and the treating physicians. The trial court made findings pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)), and plaintiff timely appealed.

## II. DISCUSSION

This case presents a first for an appellate court in this state. We must decide whether, under the facts of this case, the broad statutory shield known as ERISA (29 U.S.C. § 1001 *et seq.* (1994)) preempts a state law medical malpractice action based upon a theory of vicarious liability brought against an IPA-model HMO that contracted to arrange for health care services as part of a comprehensive employee benefits package established, maintained, and administered by a corporate employer. For the reasons that follow, we hold that it does not.

### A. Standard of Review

■ Because this case comes to us from an order granting summary judgment, we conduct a *de novo* review. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995). Summary judgment is a drastic means of disposing of litigation and therefore should be reversed on appeal if the record reveals the presence of a material question of fact or, if none, that the moving party was not entitled to judgment as a matter of law (see 735 ILCS 5/2—1005(c) (West 1998); *Zoeller v. Augustine*, 271 Ill. App. 3d 370, 374 (1995)). Plaintiff contends that summary judgment was inappropriate in this case because, as a matter of law, her medical malpractice action based upon a theory of vicarious liability was not preempted by section 514(a) of ERISA. We agree.

## B. Scope of Review

■ The supremacy clause of the United States Constitution provides that the laws of the federal government "shall be the supreme Law of the Land; *** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. Through this clause Congress is vested with the power to preempt state law. Determining whether state law is preempted by federal law, however, must begin " 'with the assumption that the historic police powers of the States [are] not to be superceded by ... Federal Act unless that [is] the clear and manifest purpose of Congress.' [Citation.]" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 120 L. Ed. 2d 407, 422, 112 S. Ct. 2608, 2617 (1992).

■ Thus, the basic question we address is whether it was the intent of Congress in enacting a statute, such as ERISA, to preempt a particular state law. *Scholtens v. Schneider*, 173 Ill. 2d 375, 379 (1996). Congressional intent to preempt state law may be gleaned from the express language of the statute if the language is clear and unambiguous; or, if not, intent may also be implied from the statute's structure and purpose. See *Scholtens*, 173 Ill. 2d at 379, citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95, 77 L. Ed. 2d 490, 500, 103 S. Ct. 2890, 2899 (1983).

In analyzing claims of federal preemption, we operate under the strong presumption that Congress did *not* intend to supercede state law. *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 654, 131 L. Ed. 2d 695, 704, 115 S. Ct. 1671, 1676 (1995). Plaintiff's claims sound in medical malpractice, which undisputably falls within the traditional ambit of state law. Therefore, defendant bears the "considerable burden" of overcoming the presumption that, in passing ERISA, Congress did not intend to displace medical malpractice claims based upon a theory of vicarious liability brought against an IPA-model HMO. See *De Buono v. NYSA-ILA Medical & Clinical Services Fund*, 520 U.S. 806, 814, 138 L. Ed. 2d 21, 29, 117 S. Ct. 1747, 1751-52 (1997). In our view, defendant has not met its burden.

■ As with any problem involving statutory interpretation, in ascertaining congressional intent, we begin with an analysis of the language of the statute. *Scholtens*, 173 Ill. 2d at 380. Section 514(a) of ERISA provides that ERISA preempts "any and all State laws insofar as they may now or hereafter *relate to any employee benefit plan*" as described in section 503 of ERISA (29 U.S.C. § 1003 (1994)). (Emphasis added.) 29 U.S.C. § 1144(a) (1994). Thus, resolution of the dispute before us requires a two-prong analysis involving the following questions: (1) whether defendant can be characterized fairly as an em-

ployee welfare benefit plan (EWBP) within the contours of ERISA, and, if so, (2) whether plaintiff's medical malpractice claim premised on a theory of vicarious liability is an action under state law that "relates to" defendant in its status as an EWBP. If the answer to either question is no, then the claim is not preempted. Because both inquires are interdependent, however, if it is easier to dispose of the controversy under the second prong (*i.e.*, assuming for the sake of argument that an EWBP exists and finding that the claim does not relate to the plan), we will do so.

## C. Is Defendant an EWBP?

Plaintiff contends that defendant itself is not an EWBP within the meaning of ERISA and therefore defendant cannot invoke the shield of ERISA preemption as a defense. In response, defendant asserts (without providing any authority except the definition of an EWBP found in ERISA itself) that "the law is completely settled" that "ERISA is triggered *** not because [it] *was* an ERISA plan, but because it *administered* an ERISA plan." (Emphasis in original.) By this, defendant admits that it is not an EWBP in and of itself; nevertheless, it claims that its status as an "administrator" of part of AT&T's EWBP confers ERISA's full panoply of protection upon it.

We decline to address whether defendant is in fact an EWBP because it is easier for us to dispose of this matter under the second prong of the two-prong analysis set out above. In other words, we assume for the sake of argument that defendant can be characterized fairly as an EWBP within the contours of ERISA and proceed to determine whether plaintiff's claims against defendant "relate to" it in its status as an EWBP. By making the assumption that defendant is an EWBP subject to ERISA, we do not intend to hold that it is or is not. However, we do recognize, contrary to defendant's characterization of the law as being "completely settled," that "there is some 'confusion' as to whether [ERISA's] 'tautological' definition [of an EWBP] encompasses HMOs and other managed care organizations" which arrange, pursuant to contract, to provide medical services for a company's EWBP participants. *Nealy v. US Healthcare HMO*, 93 N.Y.2d 209, 220 n.3, 711 N.E.2d 621, 625 n.3, 689 N.Y.S.2d 406, 410 n.3 (1999) (commenting that the Secretary of Labor, charged with interpreting and enforcing the provisions of ERISA, has noted that an HMO is not an ERISA plan at all, but rather a service provider to an ERISA plan established by an employer).

## D. Do Plaintiff's Claims "Relate to" an EWBP?

Operating under the assumption that defendant is an EWBP, we turn to whether plaintiff's medical malpractice claim "relates to" defendant in its status as an EWBP. We hold that it does not.

As mentioned earlier, ERISA preempts state laws "insofar as they *** relate to any employee benefit plan." 29 U.S.C. § 1144(a) (1994). "State law" as used in this clause includes "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1) (1994). This encompasses the common law as well as statutory law.

Due to the nature of this case, the evolution of the United States Supreme Court's ERISA preemption analysis warrants discussion. During the 1980s and early 1990s, the Supreme Court gave ERISA preemption a breathtakingly broad scope. In the 1980s the Court found that section 514(a) was "deliberately expansive." *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 46, 95 L. Ed. 2d 39, 46, 107 S. Ct. 1549, 1552 (1987). Relying strictly on section 514(a)'s language, the Court at that time was of the opinion that the breadth of ERISA's preemptive reach was apparent on its face. *Shaw*, 463 U.S. at 96, 77 L. Ed. 2d at 500-01, 103 S. Ct. at 2899-90. The Court professed that the language of section 514(a) was to be given its "broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.' " *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 739, 85 L. Ed. 2d 728, 740, 105 S. Ct. 2380, 2389 (1985), quoting *Shaw*, 463 U.S. at 96-97, 77 L. Ed. 2d at 501, 103 S. Ct. at 2900. Employing this rigid analysis, the Court found in the vast majority of cases that the state laws being reviewed had some "connection with" or "reference to" the ERISA plan in question. Nevertheless, the Court did concede that section 514(a) was perhaps "not a model of legislative drafting." *Metropolitan Life*, 471 U.S. at 739, 85 L. Ed. 2d at 740, 105 S. Ct. at 2389.

In 1995, the Court retreated from its rigid textual analysis of section 514(a). See *Travelers*, 514 U.S. 645, 131 L. Ed. 2d 695, 115 S. Ct. 1671. In *Travelers*, a unanimous Court determined that a New York statute requiring hospitals to collect surcharges from patients covered by all commercial insurers other than Blue Cross/Blue Shield was not preempted by ERISA. After years of trying to make sense of the "plain language" of section 514(a), the Court broke ranks and admitted the text is simply "unhelpful." *Travelers*, 514 U.S. at 656, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677. While reiterating that the language is expansive, the Court found that it is not limitless. *Travelers*, 514 U.S. at 655, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677. The Court questioned the wisdom of its earlier, purely textual interpretation of the language, cautioning that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop

nowhere.' " *Travelers*, 514 U.S. at 655, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677, quoting H. James, Roderick Hudson xli (New York ed., World's Classics 1980). Thus, recognizing that "infinite relations cannot be the measure of pre-emption" (*Travelers*, 514 U.S. at 656, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677), the Court concluded:

> "We simply must go beyond the unhelpful text [of section 514(a)] and the frustrating difficulty of defining its key term ['relates to'], and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Travelers*, 514 U.S. at 656, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677.

Later, in *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 136 L. Ed. 2d 791, 117 S. Ct. 832 (1997), a majority of the Court relied upon *Travelers* to find that a California prevailing wage law was not preempted by ERISA. In a concurring opinion, Justice Scalia opined that the Court's ERISA preemption analysis had been significantly changed by *Travelers*. He chastised the majority for not forthrightly acknowledging that the holdings of the pre-*Travelers* cases "have in effect been abandoned." *Dillingham*, 519 U.S. at 335, 136 L. Ed. 2d at 806, 117 S. Ct. at 843 (Scalia, J., concurring).

In *De Buono*, 520 U.S. at 813-14, 138 L. Ed. 2d at 29, 117 S. Ct. at 1751, the Court followed *Travelers* again when it explored Congress's intent in enacting ERISA in order to determine if a state law would indeed fall within ERISA's preemptive scope. The Court held that a New York gross receipt tax was not preempted because it was "one of 'myriad state laws' of general applicability that impose some burdens on the administration of ERISA plans but nevertheless do not 'relate to' them within the meaning of the governing statute." *De Buono*, 520 U.S. at 815, 138 L. Ed. 2d at 30, 117 S. Ct. at 1752. It then concluded, "Any state [law] *** that increases the cost of providing benefits to covered employees will have some effect on the administration of ERISA plans, but that simply cannot mean that every state law with such an effect is pre-empted by the federal statute." *De Buono*, 520 U.S. at 816, 138 L. Ed. 2d at 31, 117 S. Ct. at 1753.

In the face of *Travelers* and its progeny, defendant invites us to engage in the type of purely textual interpretation of the "relates to" language called into question by the Supreme Court. Defendant argues that "all state causes of action and laws not specifically provided for in the enforcement provisions [of ERISA] become subject to [its] preemption provision." It then continues, citing *Travelers* and *Scholtens*, that "a state law can 'relate to' an employee benefit plan even if the effect is indirect or incidental or if the law was not intended to specifically

affect the plan." Defendant's reliance upon *Travelers* and *Scholtens* is misplaced. A close reading of the portions of *Travelers* and *Scholtens* cited by defendant reveals that in both instances the opinions were discussing the state of Supreme Court ERISA preemption analysis as it existed in the 1980s and early 1990s, prior to *Travelers*. As a result, we decline defendant's invitation to interpret section 514(a) in the manner it proposes. Instead, in our quest to resolve this controversy, we will consider not only the language of section 514(a) but also the structure and purpose of ERISA as a whole in deciding whether the claim at issue is preempted. See *Scholtens*, 173 Ill. 2d at 383.

■ ERISA was enacted to protect the interests of participants in employee benefit plans. 29 U.S.C. § 1001(b) (1994). It subjects to federal regulation fringe benefit plans provided by employers. *Shaw*, 463 U.S. at 90, 77 L. Ed. 2d at 497, 103 S. Ct. at 2896. In enacting ERISA, Congress found that "the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered" (29 U.S.C. § 1001(a) (1994)) due to a lack of uniformity in the regulations of such plans. ERISA applies to both pension plans and welfare plans—programs that provide benefits for contingencies such as illness, accident, disability, death, or unemployment. 29 U.S.C. §§ 1002(1), (2)(A) (1994). The statute sets uniform standards for welfare plans, such as fiduciary responsibilities and reporting and disclosure requirements. 29 U.S.C. §§ 1021 through 1031 (1994).

Congress's intent in engrafting section 514(a) on ERISA was to establish regulation of the *administration* of employee benefit plans as an exclusively federal concern. *Travelers*, 514 U.S. at 656-57, 131 L. Ed. 2d at 706, 115 S. Ct. at 1677-78. In *Travelers*, the Court noted that the purpose of section 514(a) is to ensure that benefit plans are subjected to a uniform body of law that minimizes the administrative and financial burden of complying with conflicting directives among states or between states and the federal government. *Travelers*, 514 U.S. at 656-57, 131 L. Ed. 2d at 706, 115 S. Ct. at 1677-78. Thus, " '[p]reemption does not occur ... if the state law has only a tenuous, remote, or peripheral connection with covered plans, as is the case with many laws of general applicability.' " *Travelers*, 514 U.S. at 661, 131 L. Ed. 2d at 708-09, 115 S. Ct. at 1680, quoting *District of Columbia v. Greater Washington Board of Trade*, 506 U.S. 125, 130 n.1, 121 L. Ed. 2d 513, 520 n.1, 113 S. Ct. 580, 583 n.1 (1992). In summary, the Court determined that nothing in the language of section 514(a) or in ERISA's structure or purpose indicates Congress intended to displace matters of historically local concern, including state laws that govern the provision of safe medical care. *Travelers*, 514 U.S. at 661, 131 L. Ed. 2d at 709, 115 S. Ct. at 1680. Indeed, ERISA did not create "a

fully insulated legal world that renders all state law preempted whenever there is a plan in the picture." *Scholtens*, 173 Ill. 2d at 392.

We recognize that the Supreme Court's ERISA preemption analysis has been limited primarily to "regulatory"-type statutory provisions. The Court has not yet spoken directly on the issue of whether medical negligence claims against an HMO "relate to" an ERISA plan. However, lower federal courts and a few state courts have addressed the issue, with the majority of post-*Travelers* cases coming out against preemption. See *Nealy*, 93 N.Y.2d 209, 711 N.E.2d 621, 689 N.Y.S.2d 406 (citing *Travelers* and holding that a state law medical malpractice claim based upon vicarious liability brought against an HMO did not "relate to" employee benefits plan and thus was not preempted); *Pappas v. Asbel*, 555 Pa. 342, 349, 724 A.2d 889, 893-94 (1998) (same); *In re Estate of Frappier*, 678 So. 2d 884, 887 (Fla. App. 1996) (same); *Tufino v. New York Hotel & Motel Trades Council*, 223 A.D.2d 245, 250, 646 N.Y.S.2d 799, 802 (1996) (holding that a medical malpractice claim based upon vicarious liability was not preempted).

In *Pacificare of Oklahoma, Inc. v. Burrage*, 59 F.3d 151 (10th Cir. 1995), the court found that a medical malpractice claim based upon vicarious liability does not involve the administration of the plan's benefits or their level or quality but rather the doctor's negligent care and the agency relationship between the doctor and the HMO. In reaching the conclusion that the claim was not preempted, the court noted that if a state law does not affect the structure, administration, or type of benefits provided by an ERISA plan, the law should not be preempted simply because it has some economic effect on the plan. *Pacificare*, 59 F.3d at 154. The court identified four categories of state laws that should be preempted. These are (1) laws that regulate the type of benefits or terms of ERISA plans, (2) laws that create reporting, disclosure, funding, or vesting requirements for ERISA plans, (3) laws that provide for the calculation of the amount of benefits to be paid under ERISA plans, and (4) laws that provide remedies for misconduct growing out of the administration of an ERISA plan. *Pacificare*, 59 F.3d at 154. According to what it termed the majority view, the court stated:

> "[The issue of a doctor's negligence] ' "require[s] ... evidence of what transpired between the patient and physician and an assessment of whether in providing admittedly covered treatment or giving professional advice the physician possessed and utilized the knowledge, skill and care usually had and exercised by physicians in his community or medical specialty." ' [Citation.] *** [A] malpractice action 'does not involve a claim for plan benefits, a claim to enforce rights under the benefit plan or a claim challenging

administration of the benefit plan.' [Citation.] The action 'simply involves a claim that the deceased received allegedly negligent treatment from a doctor who was "held out" by the health maintenance organization as its agent.' [Citation.]" *Pacificare*, 59 F.3d at 154.

Other federal courts have shared essentially the same view. For example, in *Dukes v. U.S. Healthcare, Inc.* 57 F.3d 350, 356 (3d Cir. 1995), the court found that medical malpractice claims against HMOs based upon vicarious liability for the negligence of affiliated medical personnel were not subject to removal. In reaching its conclusion, the court distinguished between a lawsuit claiming the withholding of benefits and a claim that attacked the quality of care provided. *Dukes*, 57 F.3d at 357. It then stated, "[T]here is no allegation here that the HMOs denied anyone any benefits that they [*sic*] were due under the plan. Instead the plaintiffs here are attempting to hold the HMOs liable for their role as the arrangers of their decedents' medical treatment." *Dukes*, 57 F.3d at 361; see also *Paterno v. Albuerne*, 855 F. Supp. 1263, 1264 (S.D. Fla. 1994) (holding that ERISA does not preempt a vicarious liability medical malpractice claim against an HMO because such a case does not involve a claim for wrongful denial of benefits).

Here, defendant asserts that our decision is controlled by *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482 (7th Cir. 1996). We disagree. State courts are not bound to follow decisions of the federal district courts or circuit courts of appeal. Federal courts exercise no appellate jurisdiction over state courts; therefore, decisions of the lower federal courts are not binding on state courts (*People v. Kozlowski*, 278 Ill. App. 3d 40, 45-46 (1996)), except insofar as the decision may become the law of the case (*People v. Eyler*, 133 Ill. 2d 173, 225 (1989)) or the doctrines of *res judicata* (claim preclusion) or collateral estoppel (issue preclusion) may apply.

We note, as an aside, that plaintiff raised the issue of law of the case below. The trial court rejected plaintiff's contention that defendant was estopped from raising ERISA preemption because it had previously been fully litigated in federal court. On appeal to this court, plaintiff does not again raise estoppel through law of the case or the other preclusive doctrines. We will therefore not address or comment further on the issue.

Having clarified the precedential value of *Jass*, we are unmoved by defendant's assertion that we should follow *Jass*'s conclusion that a medical malpractice claim based on a theory of vicarious liability brought against an IPA-model HMO is in reality a denial of plan benefits and thus subject to ERISA preemption (*Jass*, 88 F.3d at 1494).

*Jass* suffers several infirmities. Most notably, *Jass* completely ignores *Travelers* and engages in the purely textual analysis of section 514(a) called into question by *Travelers*. *Jass* is also factually distinguishable from the case before us.

In *Jass*, the plaintiff sued her doctor and HMO, alleging negligence after a utilization review nurse determined a course of physical therapy following knee surgery was unnecessary. The plaintiff claimed that as a result of the HMO's denial of physical therapy she suffered permanent injury to her knee. *Jass*, 88 F.3d at 1485. The court held that the plaintiff's claims were preempted not because they asserted the physician's negligent treatment but because the physician's failure to treat stemmed from a denial of benefits—physical therapy—by a utilization review administrator. *Jass*, 88 F.3d at 1493.

In our case, there was no utilization review conducted. In fact, defendant was not in the business of conducting utilization review. Defendant, instead, attempted to control medical costs through financial incentives. Thus, if a physician wished to maximize income, it was in his or her best interest to keep referrals, hospitalizations, and expensive procedures to a minimum. There simply was no allegation of denial of benefits in this case. Rather, plaintiff alleges a treatment decision was made based upon financial considerations, not medical considerations.

We also believe *Jass*'s attempt to distinguish itself from *Pacificare* is seriously flawed. In *Jass*, the court stated that *Pacificare* was distinguishable because "the doctor alleged to have been negligent was 'one of [the HMO's] physicians.' " *Jass*, 88 F.3d at 1494, citing but not quoting *Pacificare*, 59 F.3d at 154. A close reading of *Pacificare* does not bear this out. In *Pacificare*, the plaintiff alleged vicarious liability for the medical malpractice of "a Pacificare primary care physician and alleged agent of Pacificare." *Pacificare*, 59 F.3d at 152. Nowhere in the opinion does it state that the physician was directly employed by the HMO as *Jass* implies. In *Jass*, the plaintiff's treating physician was "a physician named in [the HMO's] list of participating physicians" (*Jass*, 88 F.3d at 1485), *i.e.*, the physician was one of the HMO's physicians. In other words, the relationship between the doctor and the HMO in *Jass* may be no different from the relationship between the doctor and the HMO in *Pacificare*. *Pacificare* is simply not explicit enough to make the distinction attempted in *Jass*.

Moreover, we believe a review of the district court's opinion on which *Pacificare* was based conclusively reveals that the HMO in *Pacificare* was an IPA-model HMO rather than a staff-model HMO as suggested in *Jass*. In *Schachter v. Pacificare of Oklahoma, Inc.*, 923 F. Supp. 1448, 1450 (N.D. Okla. 1995), the court, in setting forth its statement of facts, stated:

"The defendant, PacifiCare of Oklahoma, Inc. \*\*\*, is a health maintenance organization, which furnished employee health care for the employer of Schachter's deceased mother \*\*\*. The defendant, Dr. Raymond W. Goen, \*\*\* was \*\*\* the physician who provided medical care to [the deceased]. The defendant, The Wheeling Medical Group \*\*\*, was \*\*\* the employer of Dr. Goen." *Schachter*, 923 F. Supp. at 1450.

We conclude the position taken in *Pacificare* and the majority of federal district courts is better than that taken in *Jass* and the trial court in our case.

We find *Lancaster v. Kaiser Foundation Health Plan of Mid-Atlantic States, Inc.*, 958 F. Supp. 1137, 1149-50 (E.D. Va. 1997), instructive. There, the court found that a medical malpractice claim based upon vicarious liability brought against an IPA-model HMO was not preempted by ERISA. In so finding, the court noted:

"[A]n indirect negligence claim for vicarious liability inescapably 'relates to' an employee benefit plan in that it requires at least minor reference to the plan in order to establish an agency relationship. But such reference does not sufficiently implicate the underlying objectives of the ERISA statute. The indirect negligence claims here do not purport to mandate or regulate an employee benefit plan. Instead, the claims are directed at [the physicians'] alleged negligence and the agency relationship between [the parties]." *Lancaster*, 958 F. Supp. at 1150.

See also *Crum v. Health Alliance-Midwest, Inc.*, 47 F. Supp. 2d 1013 (C.D. Ill. 1999); *Kearney v. U.S. Healthcare, Inc.*, 859 F. Supp. 182, 186 (E.D. Pa. 1994).

■ Here, plaintiff's medical malpractice claim against defendant asserts at its base that the treating physicians as agents of defendant made poor medical decisions, not based on sound medical practice, but rather based on financial considerations and economic constraints. In entering summary judgment in this case, the trial court reasoned that plaintiff's complaint that Dorothy's treating physicians were negligent due to defendant's rules or financial incentives impliedly contained "elements of a denial of benefits" or at least was "intertwined" with benefit determinations. The trial court concluded that resolving plaintiff's claims would therefore require reference to the plan documents that make her claims related to or connected with the plan. We disagree.

Poor medical decisions are not sufficiently analogous to the denial of plan benefits or sufficiently intertwined with benefit determinations to implicate ERISA preemption. In a case alleging medical malpractice of an HMO through vicarious liability, any reference to the plan documents would be necessary only for proving matters of agency, not for

wrongful plan administration or for withholding of promised plan benefits. See *Jackson v. Roseman*, 878 F. Supp. 820, 826 (D. Md. 1995).

Medical malpractice actions are laws of general applicability. They are not intended to regulate the affairs of ERISA plans. Nor do they single out such plans for special treatment nor predicate rights or obligations on the existence of an ERISA plan. Medical malpractice actions have neither the effect of dictating or restricting the manner in which ERISA plans structure or conduct their affairs nor the effect of impairing their ability to operate simultaneously in more than one state.

ERISA was enacted for the purpose of protecting individuals, not to provide loopholes through which an ERISA plan can avoid liability for its actions or the actions of its agents. Nor was ERISA enacted to provide a shield behind which to hide. See *Lancaster*, 958 F. Supp. at 1149-50. Without a clear indication from Congress, we will not impute to it the intention to void existing state laws of general applicability, such as medical malpractice actions, which protect the very beneficiaries of the ERISA statute. "Considerations of cost containment of the type which drive [*sic*] the decision making process in HMO's [*sic*] did not exist for employee welfare plans when ERISA was enacted." *Pappas v. Asbel*, 450 Pa. Super. 162, 171, 675 A.2d 711, 716 (1996). Redressing medical negligence, whether directly or indirectly, in no way runs afoul of ERISA's policies. We therefore vacate the trial court's summary judgment order in which it found that ERISA preempted plaintiff's medical malpractice action against defendant and remand the case for further proceedings.

## III. CONCLUSION

For the foregoing reasons the order of the circuit court of Kane County granting summary judgment in favor of defendant is vacated, and the cause is remanded for further proceedings.

Vacated and remanded.

INGLIS and McLAREN, JJ., concur.