[894 NE2d 1, 863 NYS2d 615]

In the Matter of THE PEOPLE OF THE STATE OF NEW YORK, by ELIOT SPITZER, as Attorney General, Respondent-Appellant, v APPLIED CARD SYSTEMS, INC., et al., Appellants-Respondents.

Argued April 29, 2008; decided June 26, 2008

## POINTS OF COUNSEL

*Arnold & Porter LLP,* New York City (*H. Peter Haveles, Jr.,* of counsel) and *Howard N. Cayne,* Washington, D.C., for appellants-respondents. I. The Attorney General's claims are barred by the total preemption provisions of the Truth-in-Lending Act. (*California Fed. Sav. & Loan Assn. v Guerra,* 479 US 272; *Rosario v Diagonal Realty, LLC,* 8 NY3d 755; *New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co.,* 514 US 645; *Medtronic, Inc. v Lohr,* 518 US 470; *Schneidewind v ANR Pipeline Co.,* 485 US 293; *Northern Natural Gas Co. v Kansas Corporation Comm'n,* 372 US 84; *Mississippi Power & Light Co. v Mississippi ex rel. Moore,* 487 US 354; *Construction Laborers v Curry,* 371 US 542; *Cipollone v Liggett Group, Inc.,* 505 US 504; *City of New York v FCC,* 486 US 57.) II. Under sections 349 and 350 of the General Business Law truthful disclosures should not be found to be misleading and deceptive absent extrinsic evidence. (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank,* 85 NY2d 20; *Matter of State of New York v Colorado State Christian Coll. of Church of Inner Power,* 76 Misc 2d 50; *State of New York v Feldman,* 210 F Supp 2d 294; *Johnson & Johnson * Merck Consumer Pharms. Co. v Smithkline Beecham Corp.,* 960 F2d 294; *Kraft, Inc. v Federal Trade Commn.,* 970 F2d 311; *Gaidon v Guardian Life Ins. Co. of Am.,* 94 NY2d 330; *Brenkus v Metropolitan Life Ins. Co.,* 309 AD2d 1260; *Sims v First Consumers Natl. Bank,* 303 AD2d 288; *Broder v MBNA Corp.,* 281 AD2d 369; *People v General Elec. Co.,* 302 AD2d 314.)

*Andrew M. Cuomo, Attorney General,* New York City (*Michelle Aronowitz, Barbara D. Underwood* and *Diana R.H. Winters* of counsel), for respondent-appellant. I. As a disclosure law, the Truth-in-Lending Act does not preempt claims for deceptive practices under either state or federal law. (*Rosario v Diagonal Realty, LLC,* 8 NY3d 755; *California Fed. Sav. & Loan Assn. v Guerra,* 479 US 272; *Drattel v Toyota Motor Corp.,* 92 NY2d 35; *Balbuena v IDR Realty LLC,* 6 NY3d 338; *New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co.,* 514 US 645; *Jones v Rath Packing Co.,* 430 US 519; *Rice v Santa Fe Elevator Corp.,* 331 US 218; *General Motors Corp. v Abrams,* 897 F2d 34; *Ford Motor Credit Co. v Milhollin,* 444 US 555; *Matter of Gaines v New York State Div. of Hous. & Community Renewal,* 90 NY2d 545.) II. Both the affirmed factual

finding of deception and the unpreserved claim that extrinsic evidence is required are beyond the scope of this Court's review; in any event the challenges are without merit. (*Chambers v Old Stone Hill Rd. Assoc.*, 1 NY3d 424; *Collucci v Collucci*, 58 NY2d 834; *People v General Elec. Co.*, 302 AD2d 314; *Matter of Lefkowitz v E.F.G. Baby Prods. Co.*, 40 AD2d 364; *People v Volkswagen of Am.*, 47 AD2d 868; *People v Network Assoc.*, 195 Misc 2d 384; *Zauderer v Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 US 626; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20; *Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330; *Broder v MBNA Corp.*, 281 AD2d 369.) III. The Attorney General is not precluded from seeking restitution for New York consumers, when that remedy serves the public interest, by the settlement of a private class action in which the Attorney General did not participate. (*Gramatan Home Invs. Corp. v Lopez*, 46 NY2d 481; *Postal Telegraph Cable Co. v Newport*, 247 US 464; *Watts v Swiss Bank Corp.*, 27 NY2d 270; *Green v Santa Fe Indus.*, 70 NY2d 244; *Richmond v United States*, 422 US 358; *Mississippi v Louisiana*, 506 US 73; *Durfee v Duke*, 375 US 106; *Sam Fox Publishing Co. v United States*, 366 US 683; *United States v Borden Co.*, 347 US 514; *EEOC v Waffle House, Inc.*, 534 US 279.) IV. Consumers who enrolled in the Credit Account Protector program and those who participated in the re-aging process were injured by the companies' deception and should receive restitution. (*Federal Trade Commn. v Cyberspace.Com LLC*, 453 F3d 1196; *State of New York v Feldman*, 210 F Supp 2d 294; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20; *Matter of State of New York v Colorado State Christian Coll. of Church of Inner Power*, 76 Misc 2d 50; *Matter of People v Telehublink Corp.*, 301 AD2d 1006; *Small v Lorillard Tobacco Co.*, 94 NY2d 43; *Matter of People v Wilco Energy Corp.*, 284 AD2d 469; *Exposition Press, Inc. v Federal Trade Commn.*, 295 F2d 869; *Resort Car Rental Sys., Inc. v Federal Trade Commn.*, 518 F2d 962; *Federal Trade Commn. v Freecom Communications, Inc.*, 401 F3d 1192.)

*William H. Sorrell*, Attorney General, Montpelier, Vermont (*Elliot Burg* of counsel), for Attorneys General of the States of Alaska and others, amici curiae. I. The lower court erred in holding that under the doctrine of res judicata, the New York Attorney General was barred by the *Allec v Cross Country Bank* settlement from seeking consumer restitution in this matter. (*Hansberry v Lee*, 311 US 32; *Richards v Jefferson County*, 517 US 793; *Chase Nat. Bank v Norwalk*, 291 US 431; *Martin v*

*Wilks*, 490 US 755; *Firefighters v Cleveland*, 478 US 501; *Walker v Liggett Group, Inc.*, 982 F Supp 1208; *Algie v RCA Global Communications, Inc.*, 891 F Supp 839; *Equal Empl. Opportunity Commn. v Pemco Aeroplex, Inc.*, 383 F3d 1280; *Commodity Futures Trading Commn. v Commercial Hedge Servs., Inc.*, 422 F Supp 2d 1057; *Federal Trade Commn. v AmeriDebt, Inc.*, 343 F Supp 2d 451.) II. To apply res judicata to a state in these circumstances would exacerbate the problem of "class action abuse." (*Amchem Products, Inc. v Windsor*, 521 US 591; *United States v East Baton Rouge Parish School Bd.*, 594 F2d 56.)

## OPINION OF THE COURT

CIPARICK, J.

This appeal arises out of a special proceeding initiated by the Attorney General, seeking restitution, civil penalties, and injunctive relief for violations of New York's Executive Law and Consumer Protection Act (*see* Executive Law § 63 [12]; General Business Law §§ 349, 350). We are asked to determine whether the federal Truth-in-Lending Act (TILA) preempts these claims of a fraudulent and deceptive credit card solicitation scheme. We conclude that it does not. We hold, however, that res judicata effect should be granted to a prior nationwide class action settlement agreement, thereby precluding the Attorney General from recovering certain restitution.

### I.

Respondent Cross Country Bank (CCB) is a Delaware bank that, since 1997, has actively solicited consumers in the "subprime" credit market to apply for its credit cards. These consumers "generally would not qualify for credit under traditional underwriting guidelines and principles."[1] Certain of CCB's marketing materials claim that the company's "purpose is to help people establish good credit." Respondent Applied Card Systems (ACS) provided, as relevant here, debt collection services for CCB's credit card accounts.

On March 28, 2003, the Attorney General filed a verified petition asserting that CCB's credit card solicitations and collections practices violated New York's Executive Law and Consumer Protection Act (*see* Executive Law § 63 [12] [fraud]; General Business Law §§ 349 [deceptive business practices], 350 [false advertising]). The gravamen of the petitioner's complaint

---

1. CCB also solicits consumers who have yet to establish a credit history.

was that CCB had misrepresented the credit limits that subprime consumers could obtain and that it failed to disclose the effect that its origination and annual fees would have on the amount of initially available credit.

For example, in its mail solicitations CCB told consumers that they were "pre-approved" for a credit limit "up to" $2,500 or $1,000. These communications further clarified that the actually-approved credit limit could be substantially less, perhaps as low as $350.[2] CCB's solicitations also explained that upon approval consumers would incur a $100 "Account Origination Fee" and a $50 "Annual Fee." But CCB's explanation of the fact that those fees would be treated as charges that could greatly reduce the amount of credit initially available to consumers was oblique.[3] In some cases, the initial fees depleted consumers' credit limits by approximately 40% or more.

As relevant here, the verified petition also contained allegations of fraud and deception pertaining to CCB's marketing of "secured cards," the Credit Account Protector (CAP) insurance program, the Applied Advantage (AA) cardholder benefit program, and a debt collection device known as "re-aging." With respect to secured cards,[4] petitioner asserted that CCB's advertisement was deceptive because its banner touted "no late fees*" and "no collections calls*," but further clarified that such fees would be imposed and such calls made in certain instances. The marketing of CAP was fraudulent and deceptive, petitioner claimed, because the program was advertised as providing coverage in the event of "death, disability, unemployment, or family leave," but—as CCB clarified in an insert and subsequently-mailed certificate of coverage—only life and

---

2. In some of its solicitations, CCB also explained that "historically," the average approved credit limit was $400.

3. For example, in one of its mail solicitations, CCB described the origination fee as a "one-time" charge. Further, near the bottom of the first page of CCB's "Credit Card Agreement," the company stated:

"**Our Charges**. You agree to pay us the following fees in connection with your Account. Such fees will be treated as Purchases on your Account . . .

"**1. Annual Fee.** Your account is subject to an Annual Fee and it will be imposed when your Account is approved and in about the same Billing Cycle of each following year."

4. Such cards were "secured" by funds on deposit in savings accounts maintained by CCB. Secured cards' credit limits corresponded to the amount of funds on deposit in those accounts. According to the verified petition, those limits were reduced by a $50 account origination fee and a $10 monthly maintenance fee. And, like its other credit cards, CCB's secured cards were subject to monthly $30 late and over-the-limit fees.

dismemberment benefits were available to New York consumers.[5] As for AA, petitioner asserted that CCB's practice of automatically enrolling consumers in the benefit program—at a cost of $34.95 per year—unless they expressly opted out of it was deceptive because the opt-out mechanism was confusing and misleading. Finally, petitioner alleged that ACS marketed re-aging as a means for severely delinquent cardholders to bring their accounts current through a series of payments, while failing to explain that over-the-limit fees would continue to accrue throughout the re-aging process and that both these fees and the previously imposed late fees would be due at the conclusion of the re-aging process.[6]

In addition to the alleged fraudulent and deceptive practices described above, the verified petition also set forth certain facts regarding respondents' late fees, finance charges, balance calculation method, and the lack of any "grace period" for consumer payments. Pursuant to TILA, these terms must be disclosed in all credit card solicitations. But petitioner claimed that many consumers were "unaware" of the manner in which charges and penalties based upon the terms were assessed to their accounts.[7] According to petitioner, these charges and penalties contributed to "trapp[ing] . . . unwary consumers" in a "vicious cycle of pyramiding debt."

On February 11, 2004, Supreme Court issued a decision and order that, in relevant part, held that petitioner was barred by res judicata from seeking restitution for pre-January 1, 2002 "front-end claims," or those concerning illegal conduct "at or near the inception of the cardholder relationship," on behalf of New York consumers who had opted to accept the benefits of a nationwide class action settlement with CCB.[8] The California Superior Court approved the settlement and dismissal of the action with prejudice on September 30, 2002 (*see Allec v Cross*

---

**5.** Petitioner further claimed that CCB's solicitations deceptively positioned the CAP authorization signature line in close proximity to the line that consumers were required to sign to accept CCB's credit card offer.

**6.** Re-aging refers to a federally-regulated process through which credit card companies enter into agreements with delinquent card holders to avoid "charging-off" such accounts due to persistent nonpayment (*see* 65 Fed Reg 36903, 36903 [2000]).

**7.** With respect to CCB's secured card advertisement, petitioner asserted that the late and over-the-limit fee information was "buried" in the application and its terms and conditions chart.

**8.** Of the New York members of the *Allec* class, only 12 chose not to accept the settlement's benefits.

*Country Bank*, No. 802894, final judgment and order of dismissal with prejudice [Sept. 30, 2002]).

In their motion to reargue the February 11 order, respondents asserted that the credit card application and solicitation disclosure requirements set forth in TILA (*see* 15 USC § 1632 [c]; § 1637 [c], [e], [f]) and its accompanying regulation, Regulation Z (12 CFR part 226), preempted petitioner's claims. Following oral argument, Supreme Court held that the claims were not preempted.

After issuing its preemption decision, the court proceeded to find "as a matter of law and fact" that CCB had "repeatedly and persistently" engaged in fraud, deception and false advertising in connection with its credit card solicitations, and that ACS's marketing of the re-aging process was similarly illegal. These rulings were based on the court's review of "volumes of evidentiary proof," including more than 100 pages of application and solicitation materials, more than 200 consumer complaints and affidavits, and the affidavits of former ACS collection employees.

On June 24, 2004, Supreme Court issued an order that, as relevant here, "permanently enjoined" respondents from engaging in future fraud, deception, and false advertising with respect to: credit limits, initially available credit, late fees and collection calls concerning secured credit card accounts, benefits available under CAP, and the benefits of account repayment plans, such as re-aging. Supreme Court also prohibited respondents from automatically enrolling consumers in AA without express authorization. The Appellate Division affirmed, rejecting respondents' preemption argument (*see* 27 AD3d 104, 109 [2005]). On January 27, 2006, Supreme Court entered an order awarding the Attorney General approximately $1.3 million in restitution and damages, $7.9 million in penalties and $2,000 in costs. In part, restitution was based upon costs incurred by virtue of the origination and annual fees as well as certain late and over-the-limit fees.

The Appellate Division modified. Upholding Supreme Court's res judicata ruling, the court held that the "public interest does not justify giving the New York consumers bound by the *Allec* settlement two chances to receive make-whole relief" (41 AD3d 4, 8 [2007] [internal quotation marks and brackets omitted]). As to respondents' appeal, the court held that Supreme Court's award of restitution for petitioner's CAP and re-aging claims

was improper. Finally, the court affirmed each of the penalties assessed.

This Court granted petitioner and respondents leave to appeal and we now affirm.

## II.

Under the US Constitution's Supremacy Clause (US Const, art VI, cl 2), the purpose of our preemption analysis is singular and straightforward. "[O]ur sole task is to ascertain the intent of Congress" (*California Fed. Sav. & Loan Assn. v Guerra*, 479 US 272, 280 [1987]; *Rosario v Diagonal Realty, LLC*, 8 NY3d 755, 763 [2007]; *see also Medtronic, Inc. v Lohr*, 518 US 470, 485 [1996] ["'(T)he purpose of Congress is the ultimate touchstone in every pre-emption case" (internal quotation marks omitted)]). Preemption can arise by: (i) express statutory provision, (ii) implication, or (iii) an irreconcilable conflict between federal and state law (*see Balbuena v IDR Realty LLC*, 6 NY3d 338, 356 [2006]).

When dealing with an express preemption provision, as we do here, it is unnecessary to consider the applicability of the doctrines of implied or conflict preemption (*see Cipollone v Liggett Group, Inc.*, 505 US 504, 517 [1992, plurality op] [statute's preemptive scope is "governed entirely" by its "express language"]). Instead, the resolution in this case turns solely upon proper statutory construction of TILA's credit card application and solicitation preemption provision (*see Matter of Frew Run Gravel Prods. v Town of Carroll*, 71 NY2d 126, 131 [1987]). In undertaking that task, we are guided by the "starting presumption that Congress does not intend to supplant state law" unless its intent to do so is "clear and manifest" (*New York State Conference of Blue Cross & Blue Shield Plans v Travelers Ins. Co.*, 514 US 645, 654, 655 [1995]; *Lohr*, 518 US at 485; *accord Balbuena*, 6 NY3d at 356).

The preemption provision at issue here was enacted as part of the Fair Credit and Charge Card Disclosure Act of 1988 (FC-CCDA), which amended TILA.[9] It states:

"(e) Certain credit and charge card application and solicitation disclosure provisions

---

9. Since its enactment in 1968, TILA has also contained another preemption provision (*see* 15 USC § 1610 [a] [1]). In contrast to 15 USC § 1610 (e), that provision preempts state laws "relating to the disclosure of information in connection with credit transactions" only to the extent of their inconsistency with TILA or Regulation Z (*see* 15 USC § 1610 [a] [1]; *see also* Clontz

"The provisions of subsection (c) of section 1632 of this title and subsections (c), (d), (e), and (f) of section 1637 of this title shall supersede any provision of the law of any State relating to the disclosure of information in any credit or charge card application or solicitation which is subject to the requirements of section 1637 (c) of this title or any renewal notice which is subject to the requirements of section 1637 (d) of this title, except that any State may employ or establish State laws for the purpose of enforcing the requirements of such sections" (15 USC § 1610 [e]).

Respondents repeatedly assert that section 1610 (e) expressly preempts "any and every state law 'relating to the disclosure of information in any credit or charge card application or solicitation.' " Petitioner counters that its claims are not preempted because they do not relate to the disclosure of credit information, but rather to affirmative deception. Based upon the statutory text, legislative history, and administrative interpretation of section 1610 (e), we agree with petitioner.

Section 1610 (e) does not preempt every state law that could potentially touch upon any credit information that respondents might choose to include in their credit card applications and solicitations. Instead it preempts those state laws that relate to "disclosure of information" in credit card applications and solicitations "subject to the requirements of section 1637 (c)," not those that prevent fraud, deception and false advertising. Preemption is limited, then, to laws that purport to alter the format, content, and manner of the TILA-required disclosures and those that require credit issuers to affirmatively disclose specific credit term information not embraced by TILA or Regulation Z (see 15 USC § 1610 [e]; § 1637 [c] [5]; see also 54 Fed Reg 13855, 13863 ["State laws relating to the terms of credit required to be disclosed or the manner in which such terms must be disclosed are preempted"]; Official Staff Interpretations of Federal Reserve System Board of Governors, 12 CFR part 226, Supp I, ¶ 28 [d] [1] [eff Jan. 14, 2008] [explaining that state laws are preempted when they require the disclosure of credit terms]).

Neither aspect of such preemption is present in this case. This is because New York's Executive Law and Consumer Protection Act, collectively, do not require respondents to dis-

and Pannabecker, Truth-In-Lending Manual: Text and Forms ¶ 2.03 [4] [2007]).

close anything. These statutes simply require that they refrain from fraud, deception, and false advertising when communicating with New York consumers.

The misleading statements in respondents' applications and solicitations regarding potential credit limits, initially available credit, secured card benefits, credit insurance coverage and re-aging benefits, and their deceptive automatic enrollment of consumers in the AA program do not constitute the disclosure of any information "which is subject to the requirements of 1637 (c)" (*see* 15 USC § 1610 [e]).[10] The only information in a credit card application or solicitation that must be disclosed pursuant to section 1637 (c) is that describing: (i) annual percentage rate, including whether such rate is variable, (ii) annual and other periodic fees, including, "membership fee[s] imposed for the issuance or availability of a credit card," (iii) minimum finance and transaction charges, (iv) grace period, (v) balance calculation method, (vi) cash advance fee, (vii) late fee, (viii) over-the-limit fee, and (ix) a statement that charges incurred are due when a periodic statement is received (*see* 15 USC § 1637 [c] [1] [A] [i] [I], [II]; [ii] [I]-[III]; [iii], [iv]; [B] [i]-[iii]; [4] [A] [iii]; 15 USC § 1637 [c] [2] [mandating, with certain exceptions, disclosure of information described in section 1637 (c) (1) (A) in telephone solicitations]; 12 CFR 226.5a [b]). Pursuant to 15 USC § 1637 (c) (5), however, the Federal Reserve Board of Governors (the Board) has authority to enact regulations requiring "the disclosure of information in addition to" that described in section 1637 (c).

The verified petition does make reference to the fact that many consumers were "unaware" of the manner in which certain credit terms, including late and over-the-limit fees, bal-

---

**10.** Petitioner's claims also do not concern the tabular format of certain TILA disclosures, disclosures in renewal notices, disclosures of percentages used to determine fees, or the disclosure of the range of fees applicable in different states. Accordingly, these claims do not implicate section 1632 (c) or subsection (d), (e) or (f) of section 1637, which are referenced at the beginning of the preemption clause at issue here (*see* 15 USC § 1632 [c] [1] [requiring presentation of "the information described in paragraphs (1) (A), (3) (B) (i) (I), (4) (A), and (4) (C) (i) (I) of section 1637 (c)" to be set forth in a tabular format, commonly known as the "Schumer Box" after FCCCDA's House sponsor, then-Representative Charles Schumer (N.Y.)]; § 1637 [d] [1] [B] [requiring disclosure in renewal statement of "the information described in subsection (c) (1) (A) or (c) (4) (A)"]; § 1637 [e] [requiring disclosure of percentage and amount used to determine "any fee required to be disclosed under subsection (c) or (d)"]; § 1637 [f] [permitting disclosure of range of fees "required to be disclosed . . . under (certain subparagraphs) of subsection (c)"]).

ance calculation method, and the lack of any grace period, were applied against their accounts. But petitioner "take[s] no issue" with the substance or sufficiency of respondents' TILA disclosures and he has obtained no relief based upon consumers' purported lack of awareness. As we previously have held, the mere fact that a complaint makes reference to certain matters that are preempted by a federal statute does not "transform" a state law action into one that is preempted under federal law (*see Nealy v US Healthcare HMO*, 93 NY2d 209, 220 [1999]).[11]

Respondents argue, however, that the statutory text compels us to conclude that section 1610 (e) bars the Attorney General's claims. Their textual argument is based primarily upon the purportedly settled construction of the phrase "relating to" in U.S. Supreme Court precedent.

The U.S. Supreme Court's interpretation of the phrase "relating to" does not help respondents. When construing other statutes, the Court has concluded that the phrase has a meaning that "express[es] a broad pre-emptive purpose" (*see Morales v Trans World Airlines, Inc.*, 504 US 374, 383 [1992]; *accord Rowe v New Hampshire Motor Transp. Assn.*, 552 US —, —, 128 S Ct 989, 994 [2008]). It has been defined as "having a connection with, or reference to" the subject matter set forth in a particular preemption clause (*see Morales*, 504 US at 384). But the Court has made clear that the scope of its interpretation of "relating to" is subject to some limitation. This is because "[i]f 'relate to' were taken to extend to the furthest stretch of indeterminancy, then for all practical purposes pre-emption would never run its course" (*Travelers*, 514 US at 655). Thus, the U.S. Supreme Court has "cautioned against an 'uncritical literalism' that would make pre-emption turn on 'infinite connections' " (*Egelhoff v Egelhoff*, 532 US 141, 147 [2001], quoting *Travelers*, 514 US at 656).

We applied these principles in *Nealy* to conclude that even when a complaint refers to matters preempted under federal law, no preemption occurs if the effect of the relief sought upon the federal scheme is " 'too tenuous, remote, or peripheral' " (*Nealy*, 93 NY2d at 220, quoting *Shaw v Delta Air Lines, Inc.*, 463 US 85, 100 n 21 [1983]). We hold this rule of limitation to be applicable here. Quite simply, petitioner's claims do not relate

---

11. This case does not present the question whether a New York Executive Law or Consumer Protection Act claim seeking relief based upon specific section 1637 (c) disclosures would be preempted. Accordingly, we offer no opinion upon the propriety of such a claim.

to the disclosure of federally-mandated information in credit card applications or solicitations. Instead, they relate to the inclusion in those materials of certain fraudulent and deceptive misinformation—none of which is even addressed by the federal disclosure scheme.

The preemption clause at issue here is very different from that in *Morales*, a case that respondents' textual argument hinges upon. There, the Airline Deregulation Act of 1978 (ADA) preempted "any law 'relating to rates, routes, or services' of any air carrier" (*Morales*, 504 US at 378-379, quoting 49 USC Appendix § 1305 [a] [1] [now codified at 49 USC § 41713]). Based on the comprehensive preemptive intent evidenced in this provision, the Court had little trouble concluding that a set of purportedly enforceable guidelines adopted by the National Association of Attorneys General, which described in excruciating detail the "content and format" of airline advertising, frequent flyer programs, and passenger compensation policies, was preempted (*see Morales*, 504 US at 379, 388, 390-414; *see also American Airlines, Inc. v Wolens*, 513 US 219, 227-228 [1995] [preemptive provision in ADA bars claims under Illinois's Consumer Fraud and Deceptive Business Practices Act]; *Air Transp. Assn. of Am., Inc. v Cuomo*, 520 F3d 218, 223 [2d Cir 2008] [ADA preempts New York's Passenger Bill of Rights because that statute requires airlines to provide certain amenities to travelers and therefore relates to "the service of an air carrier"]). But the reach of section 1610 (e) is not as expansive as that of the ADA preemption provision at issue in *Morales*.

Section 1610 (e) preempts only those state laws that relate to the format, content, manner, or substance of the TILA-required disclosures. Thus, there is no preemption here because neither petitioner's claims nor the relief he was granted below have any effect upon those disclosures (*see Nealy*, 93 NY2d at 220 [no preemption where "(p)laintiff's claims do not bind an employee plan to any particular choice of benefits, do not dictate the administration of such a plan and do not interfere with a uniform administrative scheme"]; *see also Harvey v Members Empls. Trust for Retail Outlets*, 96 NY2d 99, 106 [2001] [state insurance law and regulation relate to an Employee Retirement Income Security Act (ERISA) plan because they "impose a basic benefit structure"]). To the contrary, Supreme Court's affirmed orders did not mandate any alteration of or addition to the required section 1637 (c) disclosures. Rather, its injunction simply prevents respondents from affirmatively misrepresent-

ing the nature of credit terms that, at present, are not even subject to regulation under TILA or Regulation Z. Indeed, petitioner's entitlement to the relief granted below exists wholly apart from respondents' section 1637 (c) disclosure obligations; it is based upon "a more general obligation—the duty not to deceive" (*see Cipollone*, 505 US at 528-529 [plurality op]).

But respondents maintain that Congress's intent to create a uniform system of disclosure in credit card applications and solicitations militates in favor of preemption. We again emphasize, however, that petitioner's success in this case does not force respondents to make any alterations to their section 1637 (c) disclosures or to affirmatively disclose any additional credit terms. This is dispositive. In any event, the sort of "indirect economic influence" upon respondents' solicitations practices resulting from the relief accorded below is not sufficient to overcome the presumption against preemption of state law (*see Travelers*, 514 US at 664 [although ERISA contains a broad, "relating to," preemption clause New York law imposing surcharges on all insurers was not preempted because the law "d(id) not impose (a) . . . substantive coverage requirement"]; *accord Nealy*, 93 NY2d at 220).

We acknowledge that the U.S. Supreme Court recently reiterated that state tort judgments impose substantive requirements that "can be . . . a potent method of governing conduct and controlling policy" (*see Riegel v Medtronic, Inc.*, 552 US —, —, 128 S Ct 999, 1008 [2008] [internal quotation marks omitted]). But *Riegel* is not controlling here for two reasons. First, the Medical Device Amendments preemption provision at issue there is substantively different from 15 USC § 1610 (e). It preempted "state requirements 'different from, or in addition to, any requirement applicable . . . to [a medical] device' under federal law" (*see* 552 US at —, 128 S Ct at 1006, quoting 21 USC § 360k [a] [1]). The scope of section 1610 (e) preemption is, however, expressly limited to state laws relating to the disclosures specifically required under section 1637 (c), it does not extend to the additional state requirement that respondent must refrain from fraud and deception when making statements about credit terms that are not even within the scope of TILA or Regulation Z.

Second, unlike the tort law claims in *Riegel*, the Attorney General's success in this action will not "disrupt[ ] the federal scheme" of disclosure mandated under TILA (*see* 552 US at —, 128 S Ct at 1008). Petitioner has not sought relief based upon

the TILA-required disclosures. Nor has he sought to alter the format, content, or manner of those disclosures. The relief granted below does not impose any additional disclosure requirements upon respondents, it merely precludes them from making fraudulent and deceptive statements regarding certain credit terms (*compare Riegel*, 552 US at —, 128 S Ct at 1008 [state tort law claim preempted because Food and Drug Administration's (FDA) exacting standards for premarket approval of medical devices would be disrupted by judgment "that requires a manufacturer's catheters to be safer, but hence less effective, than the model the FDA has approved"]).

Respondents' disruption argument assumes that Congress intended the TILA disclosures to provide consumers' sole protection against credit card companies' fraudulent and deceptive marketing practices. But the qualified nature of the preemption provision's text belies that sweeping assertion, as does the statute's legislative history.

The FCCCDA's House Conference Report states that section 1610 (e) preempts "State credit and charge card disclosure laws" (*see* HR Conf Rep 100-1069, 100th Cong, 2d Sess, at 22, reprinted in 1988 US Code Cong & Admin News, at 3951, 3960). An example of such a law is California's Areias Credit Card Full Disclosure Act of 1986, which contains application and solicitation disclosure requirements very similar to TILA's (*see* Cal Civ Code §§ 1748.10-1748.12; Furletti, Comment, *The Debate Over the National Bank Act and the Preemption of State Efforts to Regulate Credit Cards*, 77 Temp L Rev 425, 451, 451 n 233 [2004]; *see also* Wis Stat Ann § 422.308 [1] [a] [requiring that "every application for (an) open-end credit plan" shall set forth certain specific information, including "(t)he annual percentage rate"]).[12] Although the Senate's version of FCCCDA would have saved provisions of such state laws that required disclosure of information in addition to that set forth in section 1637 (c) from preemption if they were reenacted within two years of the Act's passage (*see* S Rep 100-259, 100th Cong, 1st Sess, at 9-10, reprinted in 1988 US Code Cong & Admin News, at 3936, 3945-3946), the Senate compromised and "recede[d]" to the House

---

**12.** Like TILA, these state credit card application and solicitation laws mandated disclosure of only "selected costs associated with credit cards" (*see* Gelb and Cubita, *The Fair Credit and Charge Card Disclosure Act of 1988: A Federal Alternative to the Rate Ceiling Approach*, 44 Bus Law 941, 941 n 1 [1989], quoting 1986 Cal Stat, ch 1397, § 1 [a], reprinted in Cal Civ Code § 1748.10 Historical and Statutory Notes [West]).

version, which "preempted the provisions of all state laws *with respect to the disclosures mandated under its bill*" (*see* HR Conf Rep No. 100-1069, 100th Cong, 2d Sess, at 21, reprinted in 1988 US Code Cong & Admin News, at 3960 [emphasis added]; *see also* Gelb and Cubita, *Credit Card Application and Solicitation Disclosure Legislation: An Alternative to the Rate Ceiling Approach*, 43 Bus Law 1557, 1564 [1988]). The Attorney General's claims in this case do not affect any of the mandated disclosures ultimately codified by the FCCCDA nor do they require respondents to make any additional affirmative disclosures regarding their credit products. Thus, this case does not concern the sort of credit card disclosure laws preempted under TILA.

Congress also made clear that, even when enforcing the TILA disclosure requirements, states could use their unfair and deceptive trade practices acts to "requir[e] or obtain[ ] the requirements of a specific disclosure beyond those specified in Section [1637] (c) in the settlement or adjudication of a specific case or cases" (*see* HR Conf Rep 100-1069, 100th Cong, 2d Sess, at 22, reprinted in 1988 US Code Cong & Admin News, at 3960).[13] In sum, the legislative record shows that Congress only intended FCCCDA to preempt a specific set of state credit card disclosure laws, not states' general unfair trade practices acts.

Even more significantly, the Senate Banking Committee Report states that TILA does not preempt "the use of State mini-Federal Trade Commission [FTC] statutes to address unfair or deceptive acts or practices" (*see* S Rep 100-259, 100th Cong, 1st Sess, at 9, reprinted in 1988 US Code Cong & Admin News, at 3945). General Business Law §§ 349 and 350 comprise, of course, just such a "mini-FTC" act (*see Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20, 26 [1995]; *Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 323-324 [2002]). The Senate Report's understanding of TILA's disclosure requirements is reflected in the Official Staff Interpretations of the Federal Reserve Board of Governors, the agency charged by statute with administering TILA (*see* 12 CFR part 226, Supp I, ¶ 28 [d] [3] [eff Jan. 14, 2008] ["(S)tate laws prohibiting unfair or deceptive acts or practices concerning

---

**13.** The Conference Report's approval of the prospect of settlements and adjudications by which state agencies would gain the right to demand disclosures beyond those required under section 1637 (c) stands in marked contrast to the dissent's claim that Congress "wanted to cut off and fully supplant" all state regulation of credit card applications and solicitations (*see* dissenting op at 138).

credit and charge card applications, solicitations and renewals are not preempted"]; 54 Fed Reg 13855, 13864 [1989] ["(A)ny prohibitions against unfair and deceptive acts or practices (such as state 'mini-FTC acts') . . . are not preempted"]). That interpretation is entitled to great deference (*see Ford Motor Credit Co. v Milhollin*, 444 US 555, 565 [1980] ["(D)eference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive"]).[14]

Therefore, we hold that petitioner's Executive Law and Consumer Protection Act claims are not preempted by TILA or Regulation Z.

## III.

We turn next to the res judicata effect of the *Allec* settlement upon a portion of the Attorney General's claims for restitution. Pursuant to California's procedural rules (Cal Rules Ct rule

---

**14.** That the Board has recently proposed certain amendments to Regulation Z that would require credit card issuers to disclose in their applications or solicitations the effect of "fees or a security deposit" upon an applicant's credit limit, if such fees "are 25 percent or more of the minimum credit limit offered for the account" (*see* 72 Fed Reg 32948, 32954 [June 14, 2007]; *see also* 73 Fed Reg 28866, 28890 [May 19, 2008] [proposing disclosure of effect of fees or security deposit in "initial disclosure," or account-opening, statements]) does not alter our conclusion. After all, "[t]he proposal of regulations is not synonymous with [their] adoption" (*see State by Malone v Burlington N., Inc.*, 311 Minn 89, 92, 247 NW2d 54, 55 [1976]).

Moreover, the Board, the Office of Thrift Supervision, and the National Credit Union Administration, pursuant to their authority under the Federal Trade Commission Act, have also recently proposed Regulation AA, a provision of which would prohibit charging fees and security deposits that constitute a majority of a consumer's credit limit during the first 12 months of the account and would also require credit issuers to spread the cost of fees totaling more than 25% of a consumer's credit limit equally over the course of the year (*see* 73 Fed Reg 28904, 28923-28925 [May 19, 2008]). The agencies' rationale for adopting proposed Regulation AA is that the practice of charging fees that quickly deplete a new customer's credit limit "appears to be an unfair act or practice" under the Federal Trade Commission Act, the very statute General Business Law §§ 349 and 350 were modeled upon (*id.* at 28924). And to support their conclusion that consumers "may lack the information necessary to avoid harm" from this practice, the agencies cite to the Appellate Division's initial decision in the instant case (*see id.* at 28924 [quoting Appellate Division's conclusion (*see* 27 AD3d at 108) that CCB's post-2001 solicitations " 'did not represent an accurate estimation of a consumer's credit limit' "]). Thus, from these recent regulatory proposals, we can infer that TILA and Regulation Z have not previously embraced the regulation of credit limit practices that were determined to be deceptive below.

3.769 [f]), New York consumers were provided with notice of the settlement and the opportunity to "opt-in" to a nationwide settlement class. In exchange for certain payments or account credits, consumers who opted-in:

> "forever released and discharged [respondents] from any claims . . . of any nature . . . that [they] have had in the past, or now have against [respondents], which relate to the solicitation or origination of the cardholder relationship, the 'pre-approval' of persons being solicited for CCB credit cards, the Initial Credit Card Fees, the assignment of credit limits and/or the Disclosure Claims; and all claims set forth in the [*Allec*] Action."

The California court approved the settlement. And the parties do not dispute that the *Allec* action was dismissed with prejudice, thereby "forever barr[ing]" all settlement class members from prosecuting the released claims against respondents. Under California law, such a finally-approved settlement is entitled to res judicata effect (*see e.g. Johnson v American Airlines, Inc.*, 157 Cal App 3d 427, 431, 203 Cal Rptr 638, 640 [1984]; *see also* Moore and Thomas, Cal Civ Prac Procedure § 32:17 [2008 ed] ["A judgment rendered in a proper class action is res judicata as to the claims of every member of the class although they are not formal parties to the suit"]).[15]

In New York, res judicata, or claim preclusion, bars successive litigation based upon the "same transaction or series of connected transactions" (*see* Siegel, NY Prac § 447 [4th ed]) if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was (*see Gramatan Home Invs. Corp. v Lopez*, 46 NY2d 481, 485 [1979]; Weinstein-Korn-Miller, NY Civ Prac ¶ 5011.08 [2d ed]). Here, the parties' dispute focuses solely upon the second prong of the res judicata test, privity.

The Attorney General argues that he is not in privity with members of the *Allec* settlement class because his interest in

---

**15.** The California court's September 30 order states that "[a]s of Final Approval, the Action is . . . dismissed with prejudice." No order granting final approval (*see* Cal Rules Ct rule 3.769 [h] [providing for entry of judgment "after the final approval hearing"]), however, appears in the record. Nevertheless, neither party disputes Supreme Court's statement that "there is no question that the *Allec* class action was dismissed with prejudice on the merits" pursuant to the *Allec* settlement.

seeking restitution on those consumers' behalf is far broader than their individual pecuniary concerns. Rather, he seeks restitution as a means of deterring future fraud, deception, and false advertising and restoring the public's trust in the consumer credit marketplace. Amici, the Attorneys General of 30 states, agree with that view and urge us to consider the problem of "class action abuse," which, they say, has led to collusive and undervalued settlements such as that entered in *Allec*. Respondents counter by invoking our traditional solicitude towards settlement agreements, urging us to permit the *Allec* settlement class members only one opportunity to obtain make-whole relief. We agree with respondents.

Our precedents have repeatedly explained that privity is not susceptible to a hard-and-fast definition (*see Watts v Swiss Bank Corp.*, 27 NY2d 270, 277 [1970] ["(T)he term privity does not have a technical and well-defined meaning"]; *Gramatan*, 46 NY2d at 486 ["(P)rivity is an amorphous term not susceptible to ease of application"]; *Buechel v Bain*, 97 NY2d 295, 304 [2001] ["(P)rivity is ' "an amorphous concept" ' "]). Although we have provided examples of cases in which privity is present (*see Green v Santa Fe Indus.*, 70 NY2d 244, 253 [1987]; *see also Buechel*, 97 NY2d at 305), none of those are applicable here. Ultimately, we must determine whether the severe consequences of preclusion flowing from a finding of privity strike a fair result under the circumstances (*see Buechel*, 97 NY2d at 304-305). This inquiry is, of course, informed by reference to the policies that res judicata is designed to protect (*see Matter of Reilly v Reid*, 45 NY2d 24, 28 [1978]).

It is a " 'familiar doctrine' " that a class action judgment is binding upon class members who were adequately represented in the action (*see Richards v Jefferson County*, 517 US 793, 800 [1996], quoting *Hansberry v Lee*, 311 US 32, 42 [1940]; *see also Taylor v Sturgell*, 552 US —, —, 128 S Ct 2161, 2172 [2008] ["Representative suits with preclusive effect on nonparties include properly conducted class actions"]; Restatement [Second] of Judgments § 41 [1] [e] and Comment *e* [in properly authorized class actions "persons within the class are bound by a judgment for or against the representative"]; 18-131 Moore's Federal Practice—Civil § 131.40 [3] [e] [iii] ["All class members will be bound, under (res judicata), by a final judgment in a class action, including a judgment following settlement, assuming the action met the necessary procedural due process prerequisites"]). The adequacy of representation in the *Allec* ac-

tion is not at issue here (*see* Restatement [Second] of Judgments § 42 [1] [d]-[e]).

The Attorney General argues, however, that his interest in protecting the public was not represented at all in the *Allec* case. Indeed, he points out that he was not provided with notice of the settlement or an opportunity to object to it. Nevertheless, one specific portion of the relief petitioner seeks here—restitution for pre-January 1, 2002 claims—is identical to that which the New York members of the *Allec* settlement class have already pursued to a final and binding judgment. As to that measure of relief alone, we hold that there is privity.[16]

Our conclusion is supported by a core principle of res judicata, a party's right to rely upon the finality of the results of previous litigation (*see Matter of New York State Labor Relations Bd. v Holland Laundry, Inc.*, 294 NY 480, 493 [1945] ["(T)he public tranquillity demands that, having been once . . . tried, all litigation of (a) question, and between (the) parties, should be closed forever"]; *Reilly*, 45 NY2d at 28 ["*Res judicata* is designed to provide finality in the resolution of disputes"]; *cf. Matter of Olympic Tower Assoc. v City of New York*, 81 NY2d 961, 962-963 [1993] [settlement agreements entitled to res judicata effect]; Siegel, NY Prac § 444 [4th ed] [judgments entered pursuant to settlement are entitled to res judicata effect]). A similar respect for finality has informed our longstanding rule that—absent exceptional circumstances such as duress, illegality, fraud, or mutual mistake (*see Mangini v McClurg*, 24

---

**16.** Our holding is in accord with the U.S. Supreme Court's recent rejection of "virtual representation" as a basis for claim preclusion under federal common law (*see Taylor*, 552 US at —, 128 S Ct at 2178). With respect to petitioner's claim for restitution, the members of the *Allec* settlement class, on whose behalf the Attorney General sues, have already had their "day in court" (*see* 552 US at —, —, 128 S Ct at 2171, 2175). Moreover, there is no dispute that the settlement class members' interests were adequately represented in the California court, where they were afforded "the procedural safeguards" codified in California's procedural rules governing class actions (*see* 552 US at —, 128 S Ct at 2176). Furthermore, our holding today does not authorize " '*de facto* class actions,' " rather we give effect to the results obtained in an actually-litigated class action (*see* 552 US at —, 128 S Ct at 2176, quoting *Tice v American Airlines, Inc.*, 162 F3d 966, 973 [7th Cir 1998]). Finally, our conclusion does not result in the proliferation of an amorphous balancing test, requiring the evaluation of myriad case-specific factors (*see* 552 US at —, 128 S Ct at 2176). Instead, we look simply to the judgment approving a class action settlement and the nature of the claims released therein to determine the extent to which petitioner's claim for restitution is precluded.

NY2d 556, 563 [1969])—a settlement must be enforced according to its terms (see *Denburg v Parker Chapin Flattau & Klimpl*, 82 NY2d 375, 383 [1993]).

Permitting the Attorney General to seek additional restitution on behalf of the *Allec* settlement class members would undoubtedly "destroy or impair rights" conclusively established in the *Allec* case (see *Schuylkill Fuel Corp. v Nieberg Realty Corp.*, 250 NY 304, 307 [1929, Cardozo, Ch. J.]). Indeed, the Attorney General has asserted that restitution is about making consumers whole. The problem here is that the *Allec* settlement class members have already compromised their entitlement to a full measure of make-whole relief in a proper judicial forum (*cf. EEOC v Waffle House, Inc.*, 534 US 279, 297 [2002] ["(I)t 'goes without saying that the courts can and should preclude double recovery by an individual' "]). Although we recognize the importance of permitting petitioner to seek restitution to deter Executive Law and Consumer Protection Act violations, we cannot allow him to do so at the expense of undermining a validly-entered judgment of a sister state, which it is our constitutional duty to protect (US Const, art IV, § 1; 28 USC § 1738; *O'Connell v Corcoran*, 1 NY3d 179, 184 [2003]; *cf. Matsushita Elec. Industrial Co. v Epstein*, 516 US 367, 374 [1996] ["(A) judgment entered in a class action, like any other judgment entered in a state judicial proceeding, is presumptively entitled to full faith and credit"]).

Our holding does not, however, substantially prejudice the public interest served by the Attorney General in pursuing this action. Indeed, respect for the finality of the *Allec* settlement still permits the Attorney General to seek restitution on behalf of those not bound by the settlement and for the time periods not embraced therein. In addition, the claims for injunctive relief, civil penalties, and costs remain undisturbed. And, as Supreme Court noted, the Attorney General might be able to obtain disgorgement—an equitable remedy distinct from restitution—of profits that respondents derived from all New York consumers, whether within the *Allec* settlement class or not (see 41 AD3d at 8 n 2; *cf. Securities & Exch. Commn. v Fischbach Corp.*, 133 F3d 170, 175 [2d Cir 1997] ["As an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits"]; *accord Official Comm. of*

*Unsecured Creditors of WorldCom, Inc. v Securities & Exch. Commn.*, 467 F3d 73, 81 [2d Cir 2006]).[17]

We have considered petitioner's arguments regarding the Appellate Division's reversal of those portions of Supreme Court's January 27 order awarding restitution for damages allegedly incurred through consumers' participation in the CAP and re-aging programs and we find those arguments meritless. In addition, respondents' argument that extrinsic evidence of consumer deception is required to establish petitioner's Consumer Protection Act claims is unpreserved for our review.

Accordingly, the order of the Appellate Division should be affirmed without costs.

READ, J. (dissenting). The federal Truth-in-Lending Act (TILA) preempts the Attorney General's bid to impose disclosure requirements on Cross Country Bank's (CCB) credit card solicitations in the guise of this proceeding seeking injunctive relief, restitution and penalties pursuant to Executive Law § 63 (12) (fraud) and General Business Law §§ 349 (deceptive business practices) and 350 (false advertising). The majority reaches the opposite conclusion by dint of misreading TILA's special preemption rule for credit or charge card applications or solicitations. I respectfully dissent.

I.

Section 1610 (e) of TILA (15 USC) states as follows:

"Certain credit and charge card application and solicitation disclosure provisions

"The provisions of subsection (c) of section 1632 of this title [governing the form or manner of disclosure] and subsections (c), (d), (e), and (f) of section 1637 of this title [governing the content or substance of disclosure] shall supersede any provision of the law of any State relating to the disclosure of information in any credit or charge card application or solicitation which is subject to the requirements of section 1637 (c) of this title or any renewal notice which is subject to the requirements of section 1637

---

**17.** Although the Attorney General sought disgorgement as an alternative measure of relief in this case, Supreme Court did not grant that relief and—in the present posture—it would be inappropriate for us to do so.

(d) of this title, except that any State may employ or establish State laws for the purpose of enforcing the requirements of such sections."

The majority reads the clause "which is subject to the requirements of section 1637 (c)" to modify "information." Accordingly, the majority reasons, "[t]he scope of section 1610 (e) preemption is . . . *expressly limited* to state laws relating to the disclosures *specifically required* under section 1637 (c)" (majority op at 118 [emphases added]). The majority therefore concludes that "there is no preemption here because neither petitioner's claims nor the relief he was granted below have any effect upon those disclosures" (majority op at 117). That is, because there is no conflict between TILA's disclosure requirements and New York's consumer protection laws, CCB may (and indeed must) devise a solicitation complying with both federal and state law.

But the majority's reading of the statutory text is not correct. It completely

> "disregards—indeed, is precisely contrary to—the grammatical 'rule of the last antecedent,' according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows . . . While this rule is not an absolute and can assuredly be overcome by other indicia of meaning, . . . construing a statute in accord with the rule is quite sensible as a matter of grammar" (*Barnhart v Thomas*, 540 US 20, 26 [2003] [some internal quotation marks omitted]; *see also* 2A Singer and Singer, Statutes and Statutory Construction § 47:33, at 487 [7th ed 2007] ["Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent"]).

Here, the limiting clause "which is subject to the requirements of section 1637 (c)" immediately follows and therefore modifies "any credit or charge card application or solicitation," *not* "information."

The Federal Reserve System Board of Governors, which implements section 1610 (e) through its Regulation Z (12 CFR part 226), disagrees with the majority's textual analysis: the Board's expression of TILA's special preemption rule is completely at odds with the majority's apparent view that the clause "which is subject to the requirements of section 1637 (c)" modifies "information" rather than "application or solicitation." In its

discussion of section 1610 (e), the Board took the position that "[s]tate laws relating to the disclosure of credit information in credit or charge card applications and solicitations subject to the requirements of [15 USC § 1637 (c)] . . . are preempted" (54 Fed Reg 13855, 13855-13856 [Apr. 6, 1989]). Accordingly, 12 CFR 226.28 (d) states as follows:

> "(d) Special rule for credit and charge cards. State law requirements relating to the disclosure of credit information in *any credit or charge card application or solicitation that is subject to the requirements of [15 USC § 1637 (c)]* (§ 226.5a of the regulation) . . . are preempted. State laws relating to the enforcement of [15 USC § 1637 (c)] . . . are not preempted" (emphasis added).

Concomitantly, the Board has defined those credit or charge card applications or solicitations that *are* subject to the requirements of section 1637 (c) (credit or charge accounts used primarily by consumers to purchase goods and services), and those that *are not* (applications or solicitations to open overdraft lines of credit tied to asset accounts accessible by use of a debit card; open-end lines of credit accessed solely by account numbers; home equity lines of credit that may be accessed by the use of a credit or charge card and are subject to the Home Equity Loan Consumer Protection Act of 1988 amendments to TILA; applications and solicitations to add a credit or charge card to an existing open-end plan) (54 Fed Reg at 13856).

According to the Board, then, TILA supplants state law "requirements" that "relat[e] to the disclosure of credit information" in certain credit or charge card applications or solicitations (i.e., those that the Board has determined to be subject to the requirements of 15 USC § 1637 [c]) (*id.* at 13855); thus, preemption is not limited to "state laws relating to the disclosures specifically required under section 1637 (c)" (majority op at 118). The Board's view in this regard is entirely consonant with the statute's text, and with Congress' purpose in adopting a special preemption rule in the first place.

At the time TILA was enacted in 1968, "consumer credit [was] preponderantly small and local in both its nature and operation . . . [T]here [was] no national market for consumer credit . . . outside [a consumer's] town or city, although there

[was] some mail order business . . . But generally, the market for consumer credit [was] fairly restricted" (Miller and Rohner, *In Search of a Uniform Policy—State and Federal Sources of Consumer Financial Services Law*, 37 Bus Law 1415, 1415-1416 [1982] [footnotes and internal quotation marks omitted]). In deference to these state interests, TILA preserved state jurisdiction to regulate disclosures in consumer credit transactions, including so-called "traditional" credit or charge card accounts used primarily by consumers to purchase goods and services.

Specifically, section 1610 (a) (1) of TILA stated that its provisions did not "annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency." "Since the statute and the legislative history provided the [Board] with little guidance on how to implement the preemption scheme, the [Board] had substantial leeway in deciding how and when state laws would be preempted" (Tidwell, *Preemption of State Disclosures by the Truth in Lending Act: The Continuing Quest for a Workable Formula*, 40 Bus Law 933, 935-936 [1984-1985] [discussing in detail the Board's interpretation and implementation of TILA preemption from 1969 until the mid-1980s]).

In section 226.6 (b) of the original Regulation Z, the Board counseled that a state law was "inconsistent" with TILA or Regulation Z

> "to the extent that it required disclosures or actions 'different' from the requirements of the regulation with respect to form, content, terminology, or time of delivery; disclosure of the amount of the finance charge determined in any manner other than that prescribed by the regulation; and disclosure of the APR determined in any manner other than that prescribed by the regulation" (Tidwell at 936).

In addition, section 226.6 (a) of the original Regulation Z "provided that no other information could be placed with the federal disclosures if it would tend to detract from [them] or mislead or confuse the consumer" (Tidwell at 936).

It was generally left up to creditors to decide whether a state law was inconsistent, although the Board issued a number of interpretive letters. A creditor was, in fact, permitted to make

an inconsistent state law disclosure so long as it was placed on a separate piece of paper from the TILA disclosures, or below a clearly marked line on the same statement containing the TILA disclosures (12 CFR former 226.6 [c]; Tidwell at 936-937). The Board cautioned creditors "that when making a determination of what information would not mislead, confuse, or detract from required disclosures, they should be ready to justify their determinations before their enforcement agency and the courts" (*id.* at 938).

"The gist of the policy toward preemption of state laws during the 1970s" has been summarized as follows:

> "State-required disclosures were rarely, if ever, fully preempted in the sense that the creditor was forbidden to use them in contract documents. Instead, *creditors remained subject to any state disclosure law that called for more detailed or different information*, and creditors were always free to make state-required disclosures, either below a demarcation line or as permissible 'additional information' interspersed among the TIL disclosures . . . If a creditor decided to make his own preemption determinations, he ran the risk that a state court might deem the disclosure necessary for contract validity. Therefore, not assuming the risk was considered prudent" (*id.* at 941 [emphasis added]).

Not surprisingly, lengthy, complex and confusing credit forms proliferated.

Nonetheless, when Congress passed the Truth in Lending Simplification and Reform Act (Pub L 96-221 tit VI) in 1980, it only tweaked TILA's preemption provision: the inconsistency standard remained in section 1610 (a) (1), although the Board was now mandated to determine if a state law requirement was inconsistent upon the request of a creditor, state or interested party. Moreover, a state law disclosure requirement could no longer appear in consumer credit contract documents once the Board decided it was inconsistent.[1]

When it revised Regulation Z in 1981 to bring it in line with the TIL Simplification and Reform Act, the Board framed the

---

1. Interestingly, the TIL Simplification and Reform Act also amended TILA preemption so as generally to permit a creditor, state or interested party to petition the Board to determine whether a state-required disclosure was so similar to the disclosure mandated by TILA that creditors in that state could comply with the state law in lieu of making TILA disclosure (*see* 15 USC § 1610 [a] [2]).

preemption standard very narrowly so as to displace little state law. That is, a state law was now inconsistent only if it

> "require[d] a creditor to make disclosures or take actions that *contradict[ed]* the requirements of the federal law. A state law [was] contradictory if it require[d] the use of the same term to represent a different amount or a different meaning than the federal law, or if it require[d] the use of a term different from that required in the federal law to describe the same item" (12 CFR former 226.28 [a] [1], as amended at 46 Fed Reg 20848, 20906 [Apr. 7, 1981] [emphasis added]).

In short, "[t]he 'contradictory' standard" in Regulation Z

> "simply remove[d] many state disclosure provisions . . . from the scope of preemption and concomitantly allow[ed] compliance with state law in borderline situations. Allowing creditors to comply with state disclosure requirements until the [Board] ma[de] a preemption determination remove[d] any fear of creditor violation of the TILA by making these required [state] disclosures" (Tidwell at 944).

Congress next revisited TILA in a major way in 1988, when it enacted the Fair Credit and Charge Card Disclosure Act of 1988 (FCCCDA) (Pub L 100-583). By 1988, the credit card business was a large, nationwide industry, not "preponderantly small and local in both its nature and operation," as had been the case in 1968 when TILA was enacted. In addition, beginning in 1986 with Wisconsin's enactment of a disclosure statute, state legislation in this area was burgeoning: by the time the FCCCDA was adopted, "at least 11 states and Suffolk County in New York had enacted new cost of credit legislation designed to foster price competition among card issuers" (Gelb and Cubita, *The Fair Credit and Charge Card Disclosure Act of 1988: A Federal Alternative to the Rate Ceiling Approach*, 44 Bus Law 941, 941 n 1 [1989]). So this time, Congress tackled preemption head on, devising a "special" rule for disclosure of credit information in credit or charge card applications or solicitations, which "depart[ed] radically from" the inconsistency standard, "the approach which Congress historically [had] adopted in the credit disclosure area" (Gelb and Cubita at 955).

The FCCCDA dictated what credit information had to be disclosed (15 USC § 1637 [c], [e], [f]), and the manner of its

disclosure (15 USC § 1632 [c]) in credit or charge card applications or solicitations. To ensure that the marketplace did not outpace its detailed mandates, Congress in section 1637 (c) (5) provided as follows:

> "Regulatory authority of the Board

> "The Board may, by regulation, require the disclosure of information *in addition to* that otherwise required by this subsection . . . , and *modify any disclosure of information required by* this subsection . . . , in any application to open a credit card account for any person under an open end consumer credit plan or any application to open a charge card account for any person, or a solicitation to open any such account without requiring an application, if the Board determines that such action is necessary to carry out the purposes of, or prevent evasions of, any paragraph of this subsection" (emphasis added).

Section 1610 (e), as previously discussed, then specified that the provisions of sections 1632 (c) (governing the form or manner of disclosure) and 1637 (c), (e) and (f) (governing the content or substance of disclosure) "supersede[d] any provision of the law of any State relating to the disclosure of information in any credit or charge card application or solicitation which is subject to the requirements of section 1637 (c)" except to enforce TILA and Regulation Z.

Congress thus occupied the entire field of cost-of-credit disclosures in credit or charge card applications or solicitations: it set out comprehensive requirements and established a singular *federal* mechanism (the Board) to add to or modify these requirements to keep abreast of developments in the consumer credit or charge card business. A state may enforce TILA's disclosure provisions, and surely a state may bring consumer complaints to the Board's attention and advocate revisions to Regulation Z. The language of section 1610 (e) and the structure of TILA's regulatory scheme after Congress' adoption of the FCCCDA, however, belie any notion that a state may use its consumer protection laws to impose additional or different cost-of-credit disclosure on a creditor. The majority's contrary statutory interpretation produces a patchwork scheme whereby each state may effect different or additional credit disclosure requirements unless and until the Board acts pursuant to section 1637 (c) (5) to regulate the form or substance of

disclosure of the same item of credit information, which would perforce then become "information . . . which is subject to the requirements of section 1637 (c)."[2] This, of course, completely undermines the uniformity of the federal regime that Congress devised to govern a nationwide industry. Moreover, it leaves no room for the possibility that the Board may have policy reasons *not* to mandate a particular disclosure that a state considers to be warranted (*see Arkansas Elec. Cooperative Corp. v Arkansas Pub. Serv. Comm'n*, 461 US 375, 384 [1983] [Under the Supremacy Clause, "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate"]).

As the discussion of the evolution of TILA preemption illustrates, before Congress adopted the special preemption rule, states supplemented federal credit disclosure requirements with regularity. If Congress had wanted this state of affairs to continue, there would have been no need for it to supplant the inconsistency/contradictory standard in section 1610 (a) (1) (as interpreted by the Board in Regulation Z) with the special preemption rule in section 1610 (e). By reading the special preemption rule as it does, the majority has undone Congress' handiwork: the majority has effectively reinstated the inconsistency/contradictory standard for disclosures in credit or charge card applications or solicitations. While the majority cloaks its interpretation of section 1610 (e) in the garb of the presumption against preemption of state law (majority op at 118), the presumption does not empower a state court to circumvent Congress' will as expressed in nonambiguous statutory language ("In all pre-emption cases . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act *unless that was the*

---

**2.** At least I assume that the majority would, at a minimum, acknowledge that if the Board, for example, ultimately amends Regulation Z to require disclosure of the effect of fees or a security deposit upon an applicant's credit limits in credit card applications (*see* majority op at 121 n 14), the State could no longer challenge the form or substance of the disclosure of credit limits via a lawsuit grounded in state consumer protection laws. That is, when my colleagues state that "[t]he scope of section 1610 (e) preemption is . . . expressly limited to state laws relating to the disclosures specifically required under section 1637 (c)" (majority op at 118), I assume they must intend "disclosures specifically required under section 1637 (c)" to include any additional or modified disclosures required in Regulation Z by the Board pursuant to its section 1637 (c) (5) authority. If not, the injury to the federal regime would be even more severe.

*clear and manifest purpose of Congress"* [*Medtronic, Inc. v Lohr*, 518 US 470, 485 (1996) (emphasis supplied, internal quotation marks and citations omitted)]).

## II.

In this litigation, the Attorney General has taken the position—approved by the majority—that

> *"the overall impression* of CCB's representations regarding its credit cards, taken as a whole, was fraudulent and misleading to the average consumer. The flaw in these representations was not that they failed to provide the disclosures required by TILA, but rather that they affirmatively misled consumers and thus violated New York's consumer protection laws. *Because the petition alleges affirmative deception rather than inadequate disclosure, the claim is not preempted by TILA"* (appellate brief at 3 [emphases added]).

In sum, the Attorney General argued that whether or not CCB's solicitations comported with TILA or Regulation Z was basically irrelevant because he was only suing to enforce state laws prohibiting unfair or deceptive acts or practices, and TILA does not preempt these state laws. He stressed that he did not seek or obtain "an order requiring that anything actually be disclosed, but rather requested and received an order enjoining [CCB] from misrepresenting credit terms."

The foundation for the Attorney General's analytical edifice is the Board's discussion of the scope of section 1610 (e) when it revised Regulation Z to implement the FCCCDA. In fact, the Attorney General argues that the Board "directly answer[ed] the question posed in this case by declaring that 'prohibitions against unfair and deceptive acts or practices (such as state "mini-FTC acts") also are not preempted,' " quoting the Board's commentary accompanying the final version of section 226.28 (d) of Regulation Z (54 Fed Reg at 13864; *see also* majority op at 121).

First, the statement that the Attorney General seizes upon is both truncated and taken out of context. The paragraph in which it appears reads in its entirety as follows:

> "In addition, state laws regulating the substance of transactions subject to section 127 (c) [15 USC § 1637 (c) (applications and solicitations)] or (d) [15

USC § 1637 (d) (renewal notice)] are not preempted, nor are state laws preempted that regulate the form or content of the disclosure of information that is unrelated to the scope and content of information required to be disclosed under section 127 (c) or (d). Thus, for example, the following types of state laws are not preempted: laws requiring card issuers to offer a grace period[3] or prohibiting certain fees in credit or charge card transactions; laws such as retail installment sales acts and plain language laws,[4] unless they regulate the disclosure of credit term information in credit and charge card applications, solicitations or renewal notices; laws requiring notice of a consumer's rights under antidiscrimination or similar laws; and laws notifying consumers about credit information available from state authorities. *Finally, state laws regarding the enforcement of the requirements of section 127 (c) or (d) or of any prohibitions against unfair and deceptive acts or practices (such as state 'mini-FTC acts') also are not preempted"* (54 Fed Reg at 13863-13864 [emphasis added]).

This last sentence accords with the House Conference Report for the FCCCDA, which also discussed the use of mini-FTC statutes *solely* in the context of enforcing TILA and Regulation Z (*see* HR Conf Rep No. 100-1069, 100th Cong, 2d Sess, at 21-22, reprinted in 1988 US Code Cong & Admin News, at 3951, 3960;[5] *see also* Official Staff Interpretations of Federal Reserve System Board of Governors, 12 CFR part 226, Supp I, at 577 [2008 ed]; Gelb and Cubita, *Implementation of the Fair Credit and Charge Card Disclosure Act of 1988: The Regulatory Response*, 44 Bus Law 1427, 1437 [1989] ["(T)he supplementary information accompanying the final regulation indicates that (section 1610 [e]) would not preempt state laws concerning the substance of credit card arrangements[6] or the form and content of disclosures that are unrelated to the scope and content of the

---

3. *See e.g.* Personal Property Law § 413 (3) (c) (ii).

4. *See e.g.* General Obligations Law § 5-702.

5. Here, the Attorney General concededly did not bring this lawsuit to enforce TILA or Regulation Z; therefore, the comment in the House Conference Report to the effect that disclosures beyond those specified in section 1637 (c) might be required or obtained in the settlement or adjudication of such a lawsuit is beside the point here (*see* majority op at 120).

6. For example, section 1610 (e) would not have prevented the Attorney General from challenging CCB's *practice* of charging fees and security deposits

federal application, solicitation, and renewal disclosures" and, "(b)y way of illustration," offers examples]).

What is notably missing from the Board's discussion is any suggestion whatsoever that state mini-FTC laws might—after enactment of the FCCCDA with its special preemption rule— remain available as a mechanism to impose disclosure requirements on creditors over and above those mandated by TILA and Regulation Z. Indeed, the Board emphasized that

> "[s]tate laws relating to *the terms of credit* required to be disclosed or *the manner* in which such terms must be disclosed are preempted as to any credit or charge card application or solicitation that is subject to [15 USC § 1637 (c)] . . . The preemption of such provisions of state law is *total*, and differs from other provisions of the TILA which generally preempt only inconsistent state laws" (54 Fed Reg at 13863 [emphases added]).

This position is in tune with the text of section 1610 (e) and the history of the special preemption rule; it is reflected in the broad wording chosen by the Board to implement section 1610 (e)—i.e., "[s]tate law requirements relating to the disclosure of credit information" (12 CFR 226.28 [d]).

Finally, the Attorney General (and the majority) cannot evade preemption by portraying this enforcement action as a suit to enjoin a misleading and fraudulent "overall impression" rather than "inadequate disclosure." The only way for CCB to dispel the complained-about "overall impression"—the only way for CCB to comply with Supreme Court's injunction[7]—is to revise and alter the form and content of its solicitations; i.e., to make different and/or additional disclosures (*compare* majority op at 118 ["We again emphasize . . . that (the Attorney General's) success in this case does not force (CCB) . . . to affirmatively disclose any additional credit terms"]). Neither the Attorney General nor the majority explains how else CCB may eliminate the alleged misrepresentations from its solicitations.

---

that constitute a majority of a consumer's credit limit for the first 12 months of the account (*see* majority op at 121 n 14 [discussing proposed Regulation AA, which would regulate this practice under the Federal Trade Commission Act because it "appears to be an unfair act or practice" (73 Fed Reg 28904, 28923 [May 19, 2008])]).

**7.** In relevant part, the injunction enjoins CCB "from engaging in the fraudulent, deceptive and unlawful acts and practices alleged in the Verified Petition" by "misrepresenting" certain credit information.

### III.

Just a few months ago, the United States Supreme Court handed down *Riegel v Medtronic, Inc.* (552 US —, 128 S Ct 999 [2008]). Riegel sued Medtronic for damages, alleging that a catheter marketed by the company was "designed, labeled, and manufactured in a manner that violated New York common law, and that these defects caused [him] to suffer severe and permanent injuries" (552 US at —, 128 S Ct at 1005). The type of catheter implicated in Riegel's injuries had received premarket approval from the Food and Drug Administration (FDA) under a federal safety oversight regime created by the Medical Device Amendments of 1976 (MDA). The MDA includes a preemption provision; specifically, 21 USC § 360k (a) provides that a state shall not

> "establish or continue in effect with respect to a device . . . any requirement—

> "(1) which is different from, or in addition to, any requirement applicable under [federal law] to the device, and

> "(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under [relevant federal law]."

The issue in *Riegel* was whether the FDA's approval of the catheter precluded the New York common-law tort suit. The Supreme Court (affirming the United States Court of Appeals for the Second Circuit) decided that the MDA preempted Riegel's civil suit, reasoning that "[a]bsent other indication, [Congress'] reference to a State's 'requirements' includes its common-law duties," and these "requirements" were "different from, or in addition to" the federal ones (552 US at —, 128 S Ct at 1008). Further, the Court remarked that section 360k did "not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations" because in such a case the state duties would " 'parallel,' rather than add to, federal requirements" (552 US at —, 128 S Ct at 1011).

This is an even clearer case for preemption than *Riegel*. In *Riegel*, the preemption provision did not explicitly mention civil tort liability. Here, there can be no doubt that the Attorney General's claims under the Executive Law and the General Business Law are made under a "provision of the law of [the] State

relating to the disclosure of information" in solicitations governed by TILA (15 USC § 1610 [e]); or, as articulated by the Board, are "[s]tate law requirements relating to the disclosure of credit information" (12 CFR 226.28 [d]). As the Supreme Court has observed, "[t]he ordinary meaning of [the phrase 're-lating to'] is a broad one—to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with—and the words thus express a broad pre-emptive purpose" (*Morales v Trans World Airlines, Inc.*, 504 US 374, 383 [1992] [internal quotation marks and citation omitted]). The majority avoids this evident conclusion only by resorting to its faulty analysis that the "scope of section 1610 (e) preemption is . . . expressly limited to state laws relating to the disclosures specifically required under 1637 (c)" (majority op at 118).

The majority also concludes that the MDA's preemption pro-vision is broader than section 1610 (e) because the former displaces those state requirements that are "different from, or in addition to" federal law. Yet again, the majority relies on its erroneous reading of section 1610 (e) to "expressly limit[ ]" preemption "to state laws relating to the disclosures specifically required under section 1637 (c)" (majority op at 118). In fact (and as discussed previously), the wording of section 1610 (e) il-lustrates its preemption of the entire field of disclosure of cost-of-credit information in credit or charge card solicitations. Indeed (as discussed previously), under the formerly applicable inconsistency/contradictory standard, states were empowered to enforce state law disclosure requirements that differed from or added to the requirements established for credit or charge card solicitations by Congress in TILA. Congress fashioned the "special" preemption rule in section 1610 (e) precisely because it wanted to cut off and fully supplant supplemental state regulation in this area: only the Board may add to or modify TI-LA's statutory disclosure requirements.

Finally (again as discussed previously), the relief that the At-torney General sought (and has obtained) inevitably calls for CCB to alter the format and content of the disclosures in its credit or charge card solicitations of consumers *in New York*, thus "disrupt[ing] the federal scheme" envisaged and designed by Congress (*Riegel*, 552 US at —, 128 S Ct at 1008) to "enhance credit shopping" by requiring "more detailed and uniform" disclosure of credit information to consumers nationwide (54 Fed Reg at 13855; *compare* majority op at 118).

## IV.

The majority's desire to maximize our State's regulatory reach in the area of consumer protection is unsurprising. And the Board has arguably been slow to appreciate the value to consumers of at least certain of the specific disclosures at issue in this case (*see* 72 Fed Reg 32948 [June 14, 2007] [proposal by the Board to amend Regulation Z following a comprehensive review of TILA's rules for open-end (revolving) credit that is not home-secured]). But state pride and good intentions are not enough to justify this lawsuit. To borrow words from the Second Circuit's decision in a recent preemption case, "[i]f New York's view regarding the scope of its regulatory authority carried the day, another state could be free to enact" its own laws or bring its own lawsuits to supplement or modify the credit disclosures required by TILA and Regulation Z, thus "unraveling the centralized federal framework" in this area (*Air Transp. Assn. of Am., Inc. v Cuomo*, 520 F3d 218, 225 [2d Cir 2008] [determining that federal law preempts New York State's Passenger Bill of Rights (General Business Law § 251-g [1])]). In enacting section 1610 (e), Congress essentially decided that the benefits from a uniform, nationwide regime for disclosure under the aegis of the Board outweighed any loss of protection to consumers under state law. The Supremacy Clause permits Congress to make this judgment, and we are bound to honor it. Accordingly, I respectfully dissent.

Chief Judge KAYE and Judges GRAFFEO, PIGOTT and JONES concur with Judge CIPARICK; Judge READ dissents in a separate opinion; Judge SMITH taking no part.

Order affirmed, without costs.